UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CENCAP FEDERAL CREDIT UNION,
on behalf of itself and its members,

*Plaintiff,*

-against-

FISERV SOLUTIONS, LLC f/k/a
FISERV SOLUTIONS, INC., and
FISERV, INC.,

*Defendants.*

Case No.: _____

## ORIGINAL COMPLAINT AND DEMAND FOR JURY TRIAL

Charles J. Nerko*
Brian D. Rich
Matthew J. Smith*
Xun Chen*
BARCLAY DAMON LLP
1270 Avenue of the Americas, Suite 501
New York, NY 10020
212.784.5800
cnerko@barclaydamon.com
brich@barclaydamon.com
msmith@barclaydamon.com
xchen@barclaydamon.com

*Attorneys for Plaintiff*
*Cencap Federal Credit Union,*
*on behalf of itself and its members*

\* Not admitted in D. Conn; *pro hac vice* application to be filed

31039315

## TABLE OF CONTENTS

NATURE OF ACTION ........................................................................................... 1

PARTIES ............................................................................................................... 3

JURISDICTION & VENUE ................................................................................... 4

FACTUAL BACKGROUND .................................................................................. 4

    Fiserv's False Security Promises ..................................................................... 6

    Fiserv's Chronic Security Failures.................................................................. 7

    Persistent Security Problems in Fiserv's "Virtual Branch" Online Banking System and
    Client360 Portal ............................................................................................. 12

    Despite Fiserv's Actual Knowledge of Problems
    with Virtual Branch Security and the Client360 Portal,
    The System Has Remained Insecure and Jeopardized Cencap Federal.............................. 17

    The Severe Impact on Cencap Federal and Its Members ................................... 19

    Fiserv Attempts to Charge Punitive Termination Fees When Cencap Federal Seeks to Exit
    the Insecure Services....................................................................................... 21

    Fiserv's Misconduct Warrants Punitive Damages ............................................ 22

    Cencap Federal's Claims Are Timely, as Both the Statute of Limitations and Contractual
    Limitations Period Have Been Tolled............................................................... 24

FIRST CLAIM FOR RELIEF:
Breach of Contract / Promissory Estoppel:
Fiserv Solutions' Master Agreement
(Against Fiserv Solutions Only) ....................................................................... 26

SECOND CLAIM FOR RELIEF:
Breach of Contract / Promissory Estoppel:
Fiserv's Privacy Notice..................................................................................... 30

THIRD CLAIM FOR RELIEF:
Connecticut Uniform Trade Secrets Act .......................................................... 31

FOURTH CLAIM FOR RELIEF:
Defend Trade Secrets Act ................................................................................. 33

FIFTH CLAIM FOR RELIEF:
Negligence / Gross Negligence......................................................................... 34

SIXTH CLAIM FOR RELIEF:
Fraud / Fraudulent Inducement ........................................................................... 36

SEVENTH CLAIM FOR RELIEF:
Bailment ................................................................................................................ 39

EIGHTH CLAIM FOR RELIEF:
Conversion ............................................................................................................ 40

NINTH CLAIM FOR RELIEF:
Unjust Enrichment ................................................................................................ 41

TENTH CLAIM FOR RELIEF:
Declaratory Relief ................................................................................................ 42

ELEVENTH CLAIM FOR RELIEF:
Rescission of Master Agreement
(Against Fiserv Solutions Only) ........................................................................... 45

TWELFTH CLAIM FOR RELIEF:
Injunction ............................................................................................................. 46

JURY TRIAL DEMAND ...................................................................................... 47

DEMAND FOR RELIEF ...................................................................................... 47

31039315

Represented by Barclay Damon LLP, plaintiff Cencap Federal Credit Union ("Cencap Federal"), on behalf of itself and its members, alleges as follows against defendants Fiserv Solutions, LLC f/k/a Fiserv Solutions, Inc. ("Fiserv Solutions") and Fiserv, Inc. (collectively, "Fiserv"):

## NATURE OF ACTION

1.      Fiserv promised world-class cybersecurity but delivered insecurity and dangerous deception. Rather than safeguarding sensitive financial data, Fiserv's flawed online banking platform and ticketing system routinely exposed over 9,000 credit union members to fraud, identify theft, and compromise. Despite knowing its platforms were insecure, Fiserv chose profits over protection. This action holds Fiserv accountable for breaching its fundamental duties to safeguard the extraordinarily sensitive information entrusted by its financial institution customers, and seeks redress for those harmed by its misconduct.

2.      While Fiserv markets itself as a leader in financial institution technology committed to data security, its "Virtual Branch" online banking platform and Client360 portal suffer from longstanding security problems.

3.      Even after Fiserv was sued by its other financial institution customers in 2019 and again in 2022 for not implementing proper security controls on the Virtual Branch online banking system, Fiserv continued neglecting security problems. To Fiserv, it was more important to keep its security problems under wraps than to invest in fixing security holes that potentially threatened scores of financial institutions and customers.

4.      According to *The Wall Street Journal,* Fiserv's misconduct is a part of a pattern of victimizing small financial institutions and the consumers they serve. After decades of acquiring other technology providers, Fiserv now dominates the market. Fiserv's strategy is to buy up its smaller competitors to stymie competition. Meanwhile, Fiserv ceases to make the proper financial

1

investments to keep up with emerging technology and security risks—while attempting to lock financial institutions into long-term contracts, attempting to intimidate and silence its customers from disclosing to other affected customers when there are security problems, and holding customers' data hostage when those customers seek to go to competitors. This gambit has fattened Fiserv's profits but exploited smaller financial institutions and the customers they serve. While midsize and local banks hold 13% of primary banking relationships, they capture only 7% of the customers who switch banks, unable to compete effectively for new businesses. *See* "Frustrated by the Tech Industry, Small Banks Start to Rebel," *The Wall Street Journal,* April 11, 2019, https://www.wsj.com/articles/small-banks-rebel-against-the-most-important-tech-firms-you-have-never-heard-of-11554975000. **Exhibit 1** is a true and correct copy of the *Wall Street Journal* article.

5.    Even after prior lawsuits and warnings about security problems, Fiserv has still failed to this day to implement basic security protections financial institutions have used for years, including:

a.    **Shockingly Easy Account Takeover**. Criminals can hijack online banking accounts with just three pieces of easily obtained information: Street address number (publicly known and visible on any piece of mail), account number (printed on every check), a Social Security number (available through data breaches or simple guessing). Once criminals obtain this basic information, they can take over online banking accounts for legitimate members and drain their funds without detection. Contrary to contractual requirements and industry standards, Fiserv never required multi-factor authentication to protect the new account enrollment process.

b. **Inadequate Login Protection.** After a Virtual Branch account is created, the system will sometimes ask for an answer to a security question, in addition to a username and password. However, since the original process of establishing the security questions is itself insecure and devoid of multi-factor authentication, this security control is illusory.

c. **Vulnerable Support Systems.** Fiserv's Client360 portal, where Cencap Federal submits service requests containing confidential information, uses the same weak username-and-password login, and omits multi-factor authentication. Criminals who access this system can manipulate banking settings and steal confidential data.

6.      This lawsuit seeks immediate court intervention to protect Cencap Federal's 9,000 members from ongoing security risks, full compensation for damages caused by Fiserv's insecure service, disgorgement of all profits Fiserv earned while failing to deliver promised protections, a declaration that Cencap Federal owes no termination fees to a vendor that breached its fundamental duties, and punitive damages.

## **PARTIES**

7.      Plaintiff Cencap Federal Credit Union is a federally chartered, not-for-profit credit union with localized operations in Hartford, Connecticut. Cencap Federal has a principal place of business at 443 Franklin Ave, Hartford, CT 06114.

8.      Cencap Federal has over 9,000 members and also seeks declaratory and injunctive relief against Fiserv on its members' behalf under the associational standing doctrine. Cencap Federal's members would otherwise have standing to sue Fiserv in their own right, the interests Cencap Federal is protecting is germane to its purpose as a federal credit union, and the

participation of Cencap Federal's members is not required for adjudicating the associational claims or awarding relief on them.

9.      Defendant Fiserv Solutions, LLC was formerly known as Fiserv Solutions, Inc. and is a limited liability corporation organized under the laws of Wisconsin, with a principal place of business located at 600 N. Vel R. Phillips Ave., Milwaukee, WI 53203.

10.     Defendant Fiserv, Inc. is a corporation organized under the laws of the State of Wisconsin with a principal place of business at 600 N. Vel R. Phillips Ave., Milwaukee, WI 53203.

## JURISDICTION & VENUE

11.     This Court has subject matter jurisdiction over the claims in this Complaint pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1332 (diversity).

12.     Venue in the District of Connecticut is proper because Fiserv regularly conducts business in Connecticut, Fiserv has purposely availed itself of the benefits and protections of Connecticut law, a substantial part of the misconduct occurred in this district, and a substantial part of property that is the subject of the action is situated in this district.

13.     This Court has personal jurisdiction over Fiserv because Fiserv operates in this district and/or has contacts with this jurisdiction sufficient to subject it to personal jurisdiction.

## FACTUAL BACKGROUND

14.     Founded in 1950, Cencap Federal Credit Union began as the Hartford Municipal Employees Federal Credit Union and has a longstanding history of serving the Hartford, Connecticut community. As a credit union, Cencap Federal is structured as a not-for-profit cooperative owned by individual customers, who pool their resources to provide credit to one another. For 66 years, it primarily served municipal employees. In January 2017, it rebranded as Cencap Federal to reflect its expanded membership eligibility, now including individuals who live, work, learn, or pray in certain underserved areas in and around Hartford. As of March 2025,

Cencap operates two branches in Hartford, employing 18 staff members and serving more than 9,000 members. It offers a range of financial products and services, including savings and checking accounts, loans, and online banking tools.

15.    Founded in 1984, Fiserv is one of the world's largest providers of technology solutions to credit unions, banks, and other financial services providers. According to Fiserv's website, it has approximately 10,000 financial institution clients, and provides technology to more than one in three financial institutions in the United States. *See* https://www.fiserv.com/en/who-we-serve/bank.html. More than $30 Billion of transactions each day move through Fiserv's systems. *See* https://www.fiserv.com/en/solutions/data-aggregation.html.

16.    Fiserv has provided account processing services for Cencap Federal. An account processing system is the "brains" behind a financial institution, processing and recording all transactions for the financial institution. For example, Fiserv provided technology to power tellers' computers and maintain Cencap Federal's account records.

17.    Fiserv also hosted Cencap Federal's online banking system, which is called "Virtual Branch." Fiserv processed members' transactions originating from that website. Once a person accessed Virtual Branch, they could engage in transactions affecting a Cencap Federal account, including transferring funds in and out of the account.

18.    In addition to Virtual Branch, Fiserv also furnished the Client360 portal, a platform where Cencap Federal and other Fiserv customers submit service requests and change orders related to its core banking products. Through Client360, Cencap Federal communicates with Fiserv to modify account settings, update services, and address technical issues. These requests often contain confidential information necessary to provide the context for processing the tickets. Having unauthorized access into the Client360 portal would allow malicious actors to submit

fraudulent service requests, manipulate account and administrative settings, and alter critical configurations for Cencap Federal's core banking products, which would in turn aid an unauthorized individual's access to member account details and confidential personal information.

19.     Fiserv acknowledges in its publicly posted Code of Conduct & Business Ethics that "[i]t is our responsibility to safeguard confidential information when it is collected, used, transmitted and stored to prevent any unauthorized disclosure." *See* https://investors.fiserv.com/corporate-governance/governance-documents. But this responsibility has not been fulfilled.

### *Fiserv's False Security Promises*

20.     Cencap Federal and Fiserv Solutions entered into a "master agreement" (the "**Master Agreement**") for technology services. **Exhibit 2** is a true and correct copy of the Master Agreement, as amended.

21.     Among the misrepresentations made by Fiserv to induce Cencap Federal to enter into the Master Agreement was that Fiserv would "use the same care and discretion to prevent unauthorized disclosure of Information as it uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law" and that Fiserv would not "disclose any 'non-public personal information' about [Cencap Federal]'s customer information in any manner prohibited by Title V of the Gramm-Leach-Bliley Act or the regulations issued thereunder, as applicable to Fiserv." *See* Master Agreement § 3(b). This would encompass providing adequate security for the confidential Cencap information stored in "Virtual Branch," hosted by Fiserv Solutions, which was to become Cencap Federal's online banking website. This would also encompass providing adequate security for the Client360 portal, where Cencap Federal sends its servicing requests to Fiserv, and which may include confidential,

sensitive information, yet this portal is only secured by a simple username and password, without two-factor authentication.

22.    Fiserv, Inc. also maintains a publicly available Privacy Notice that applies to all subsidiaries, including Fiserv Solutions, which promises to maintain "appropriate security measures to prevent your personal data from being accidentally lost, used or accessed in an unauthorised way" and "compliance with global Payment Card Industry Data Security Standard (PCI DSS)." https://www.fiserv.com/en/about-fiserv/privacy-notice.html.

23.    As set forth in greater detail below, Fiserv's representations concerning the adequacy of its protection against the unauthorized disclosure of sensitive information for its Virtual Branch online banking website and Client360 portal were false. In reality, Fiserv employed grossly deficient authentication processes, exposing Cencap Federal and its members to easy exploitation by hackers.

24.    Fiserv has not performed in accordance with the Master Agreement, has breached the express and implied terms of the Master Agreement, and has engaged in other misconduct that has harmed Cencap Federal and its members.

### *Fiserv's Chronic Security Failures*

25.    In February 2019, security analyst SecurityScorecard, Inc. rated Fiserv a "C" on its A to F scale, reflecting serious, chronic security weaknesses. **Exhibi**t **3** is a true and correct copy of SecurityScorecard's analysis of Fiserv.

26.    According to SecurityScorecard, Inc., a company rated below a "B" is 5.4 times more likely to suffer a consequential breach than a company with proper security practices.

27.    Fiserv consistently neglected cybersecurity fundamentals. It delayed critical software patches, used obsolete systems, employed weak encryption protocols, and permitted vulnerabilities easily exploited by hackers. Indeed, in the course of conducting a security review

7

of Fiserv, SecurityScorecard, Inc. uncovered over 40 weaknesses in Fiserv's security, including the following:

    a.   Fiserv fails to promptly update and patch affected systems to protect against commonly known security vulnerabilities and exposures, including delaying remediation of high-severity vulnerabilities for more than 30 days after publication.

    b.   Fiserv employs products and services past their end-of-life or end-of-service deadlines. As these products and services are no longer marketed, sold, or upgraded by the manufacturers, they are more likely to be exploited and to have unpatched security vulnerabilities.

    c.   In March 2018, Fiserv was observed engaging in communications indicative of a malware infection.

    d.   In June 2018, Fiserv was observed engaging in communications indicative of yet another malware infection.

    e.   Fiserv runs servers using an obsolete Secure Shell (SSH) network protocol that contains fundamental weaknesses that can be readily exploited by hackers, including a design flaw that allows a man-in-the-middle attack.

    f.   Fiserv employs weak ciphers and encryption certificates that are expired, are self-signed, and have weak signatures.

    g.   Fiserv's web applications do not implement X-XSS-Protection best practices, meaning that hackers can send malicious URLs that inject code into Fiserv-hosted websites.

    h.   Fiserv's web applications do not implement X-Content-Type-Options Best Practices, which could lead to security issues and the execution of malicious code.

i.  Fiserv's websites do not implement HSTS best practices, which render Fiserv-hosted sites vulnerable to a man-in-the-middle attack that can divert users to malicious websites.

j.  Fiserv's websites do not enforce HTTPS encryption, leaving users vulnerable to man-in-the-middle attackers who can falsify data and inject malicious code.

k.  Fiserv's websites redirect users to a new URL in a way that cannot be secured with HTTPS and HSTS headers, leaving users vulnerable to being redirected to spoofed or malicious versions of the sites.

l.  When a user is redirected to his or her ultimate URL destination, the user passes through one or more URLs served over HTTP (instead of HTTPS), which weakens other security technologies (such as HTTPS and HSTS headers) that are deployed elsewhere.

m.  Fiserv does not implement X-Frame-Options best practices, which allows other, untrusted websites to embed a Fiserv-hosted website in a frame on their page. This can be used to make social-engineering attacks appear more legitimate, or it can be used for clickjacking attacks.

28.  Despite multiple warnings about its flawed security, Fiserv failed to implement meaningful improvements, leaving financial institutions and their customers vulnerable. Fiserv has been repeatedly put on notice that its security measures are deficient, leaving Cencap Federal information at risk. Rather than addressing the problems by updating its security, Fiserv continued to use outdated security methods long after vulnerabilities were brought to Fiserv's attention. This left Cencap Federal, its members, Fiserv's other customers, and those customers' own customers at risk.

29.     Even today, Fiserv continues to fall short of industry security standards, maintaining elevated risk of significant breaches. Six years after the 2019 SecurityScorecard report, Fiserv still has not fixed all of its security problems. Fiserv's current SecurityScorecard rating of 81 out of 100 possible points is surprising given the extraordinarily sensitive information stored by Fiserv and indicates that Fiserv still harbors security deficiencies that makes Fiserv ***2.9 times more likely to suffer a breach*** than companies having proper security practices. *See* https://securityscorecard.com/security-rating/fiserv.com (Fiserv security rating is 81/100 or a B); https://securityscorecard.com/wp-content/uploads/2024/04/EBOOK-MachineLearning-3.0_v2.pdf at 9 (companies with only a "B" security rating like Fiserv are 2.9 times more likely to be breached).

30.     Separately, in August 2018, *Krebs on Security* reported that a customer of a small financial institution discovered a security problem with Fiserv that permitted unauthorized individuals to see customers' account and transactional records, and to add or delete phone numbers and email addresses used to receive alerts about account transactions. *See* "Fiserv Flaw Exposed Customer Data at Hundreds of Banks," https://krebsonsecurity.com/2018/08/fiserv-flaw-exposed-customer-data-at-hundreds-of-banks/.

31.     Despite customer efforts to notify Fiserv directly (including messages sent to the social media accounts of Fiserv's CEO and various other individuals who were identified as affiliated with Fiserv), Fiserv ignored these warnings until media scrutiny compelled it to implement a patch.

32.     Fiserv spokesperson Ann Cave admitted publicly that Fiserv delayed addressing these known problems until media exposure forced its hand, confirming its reckless disregard for customer security. Ms. Cave confirmed that Fiserv did not make efforts to remediate this known

threat until **after** receiving an inquiry from a **reporter**—when negative press coverage was imminent. According to Ms. Cave, "After receiving [the reporter's] email, [Fiserv] promptly engaged appropriate resources and worked around the clock to research and remediate the situation. [Fiserv] developed a security patch within 24 hours of receiving notification and deployed the patch to clients that utilize a hosted version of the solution. [Fiserv] will be deploying the patch this evening to clients that utilize an in-house version of the solution." Thus, only after Fiserv faced the imminent prospect of negative press attention did Fiserv "promptly engage[] appropriate resources" to fix its security lapse. This delay, however, left hundreds of financial institutions vulnerable long after Fiserv knew of the risk.

33.    Unfortunately, Fiserv's corporate culture discouraged emphasis on data security. For example, even one of Fiserv's own employees recognized the inadequacy of Fiserv's support and outreach channels. In a post responding to the Krebs on Security article, Adam Kinder, Fiserv's Information Security Manager, publicly invited customers to message him through his personal social media account[1] so that he "can use what influence [and] means I have at our company, above and beyond customer support and outreach branches, to address their concerns."

---

[1] Fiserv's Code of Conduct & Business Ethics, which was in effect at or around the time of Kinder's comment, contains a social media policy that covers the use of LinkedIn, Twitter, Facebook, forums, and blogs, and Fiserv regulates its employees' use of Fiserv's trademarks on social media. Fiserv notes that social media "is an established part of many people's personal and professional lives-and the lines have blurred." *See* https://web.archive.org/web/20230601125645/https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c. The current version of Fiserv's Code of Conduct & Business Ethics, which contains the same social media policy is available at https://d1io3yog0oux5.cloudfront.net/_583f477852403c9df0b7b630e3701167/fiserv/db/2275/21421/file/Code+of+Conduct+%26+Business+Ethics.pdf. Accordingly, Fiserv knows, or should have known, about communications sent to the social media accounts of its agents who have identified themselves as Fiserv representatives on social media platforms.

### *Persistent Security Problems in Fiserv's "Virtual Branch" Online Banking System and Client360 Portal*

34.    Cencap Federal's online banking system is provided by Fiserv and called "Virtual Branch." Virtual Branch has a sordid history of multiple security problems.

35.    As of today, creating an online banking account through Fiserv's Virtual Branch requires only basic, easily obtainable personal information. All that Fiserv requires to register for an online banking account with Cencap Federal is an account number, the member's Social Security number, and street address number. Given the weak security controls Fiserv had implemented on Cencap Federal's online banking enrollment workflow, an unauthorized individual can create and take over a member's online banking account and gain control over it by obtaining the member's street address, account number (such as from the face of a check or guessing an account number based upon the sequence used to assign account numbers), and then either knowing or guessing the member's Social Security number. Once an online banking account is created, hackers can freely access all account information and conduct unauthorized transactions without any additional security barriers.

36.    Compounding this vulnerability, all that is required for someone to access a member's online banking account is entering their username and password and occasionally (but not always) the answer to a user-created security question (which is illusory because it is created without multi-factor authentication. Fiserv placed no meaningful limits on login attempts, such as multi-factor authentication, which its own contract and applicable standards require.

37.    Astoundingly, Cencap Federal specifically paid additional fees to implement two-factor authentication for the Virtual Branch platform on a per-user basis. *See* Master Agreement, Virtual Branch Services Schedule to the ASP Services Exhibit. Yet, despite collecting additional fees for this security feature, Fiserv left the Virtual Branch completely unprotected by two-factor

authentication, leaving confidential, sensitive information protected by nothing more than username and password combinations.

38.     In or around 2022, another credit union that used Fiserv as its core banking vendor, the US Court House SDNY Federal Credit Union, the credit union for a District Court's judges and employees, filed a lawsuit against Fiserv arising out of other security controls on that credit union's online banking system. *US Court House SDNY Federal Credit Union et al. v. Fiserv Solutions, LLC et al.*, No. 1:22-cv-09329 (S.D.N.Y. 2022). Specifically, upon information and belief, as far back as 2018, registering for an online banking account on the platform Fiserv provided required only an account number and the last four digits of the member's Social Security number. The online banking website had no rate limiting measures after a new account has been created. The fact that these allegations stem from a lawsuit filed three years ago and yet mirror similar vulnerabilities currently affecting Cencap Federal's Virtual Branch shows a persistent and unresolved failure in Fiserv's security practices, and its unwillingness to invest in necessary technology to protect its clients' highly sensitive information.

39.     Prior to that, Fiserv was sued yet again for these Virtual Branch security failures. *See Bessemer System Federal Credit Union v. Fiserv Solutions, LLC et al.*, No. 2:19-cv-00624-RJC (W.D. Pa. 2019).

40.     Beyond the vulnerabilities in Fiserv's Virtual Branch, Cencap Federal's sensitive information is further exposed through the Client360 portal, a publicly-accessible website used for managing service tickets, support requests, and other communications with Fiserv. Through this portal, Cencap Federal would communicate with Fiserv requesting changes to the core banking products and services that Fiserv provides, often including sensitive information to provide necessary context for these service requests. Despite handling confidential information and

13

handling requests that would affect system security, the Client360 portal is only secured by a simple username and password, without additional security protection such as two-factor authentication.

41.    Like the Virtual Branch, the lack of proper security protections on the Client360 portal makes it highly susceptible to unauthorized access. Anyone with login credentials can enter the Client360 platform without any secondary verification step, making it far easier for unauthorized parties to intercept or manipulate service requests by impersonating credit union employees.

42.    Ironically, Fiserv's own Client360 User Guide and Admin Guide both recognize that multifactor authentication is a necessary security protection considering the highly sensitive information accessible through the portal. *See* "Cient360 User Guide", https://virtualtrainer. fiservapps.com/TrainGuides/Client360/Client360_UserGuide.pdf ("Users must authenticate upon every sign-in to confirm their identity, since all users have access to information specific to their financial institution such as contacts, inquiries, and sensitive notes/attachments") "Client360 Admin    Guide",    https://virtualtrainer.fiservapps.com/TrainGuides/Client360/Client360_ AdminGuide.pdf ("To ensure the security of a user's financial institution information, authentication is required for every sign-in. This confirms the user's identity and allows access to personal information, including contacts, inquiries, and sensitive notes/attachments.")

43.    Fiserv had actual knowledge that the security controls it placed on Cencap Federal's online banking website were inadequate. Indeed, Fiserv's own website notes that that using a Social Security number is insufficient to authenticate an authorized user of an online banking account because fraudsters already have that information. It took this article offline after it was cited in a litigation against them. However, the webpage has been archived:

14

> Fraudsters look for ways to take over customers' and members' accounts, often with online banking credentials.... Any vulnerabilities in the account-opening process will likely be tested.... *If I call my bank to reset my password, and they ask* my mother's maiden name or *last four digits of my Social Security number, that's not enough...* Fraudsters already have that information.

*See*     https://web.archive.org/web/20220929195830/https://www.fiserv.com/en/about-fiserv/the-point/managing-p2p-payment-risk-real-time-environment.html (emphasis added).

44.     Even if fraudsters did not already know a member's Social Security number, Fiserv admitted in past litigation involving Virtual Branch security failures that it did not impose rate limiting. In other words, there was no "lockout" enforced by Fiserv's online banking system to stop unauthorized individuals from using a pure trial-and-error guessing process (which can easily be automated) to guess the last four digits of a member's Social Security number and gain access to Cencap Federal's online banking accounts. As a consequence, an unauthorized individual could take over an online banking account merely by guesswork, or cycling through "0001" to "9999."

45.     It would be expected that a company as sophisticated as Fiserv would implement appropriate controls to safeguard Cencap Federal's online banking accounts and Client360 portal against unauthorized access through trial-and-error, "guessing" or other reasonably foreseeable attacks. With respect to Cencap Federal's online banking website and Client360 Portal, Fiserv failed to implement reasonable security controls such as those that:

    a.    require multi-factor authentication;

    b.    require the use of an authentication procedure with sufficient complexity and secrecy;

    c.    implement a rate-limiting mechanism to effectively limit the number of failed authentication attempts that can be made on an online banking account;

    d.    require an individual to complete a "captcha" (a simple puzzle used to thwart automated access attempts);

    e.    impose an adequate waiting or lockout period following a failed login attempt; and

    f.    leverage other risk-based or adaptive authentication techniques to identify user behavior that falls outside typical norms, including repetitive, highly anomalous behavior consistent with a "guessing" or trial-and-error method to gain access to Cencap Federal's online banking website and Client360 portal.

46.    Fiserv concedes that it may not be able to protect its customers' records from future data breaches in its most recent SEC Form 10-K dated February 20, 2025:

> ***We expect that unauthorized parties will continue to attempt to gain access to our systems*** …. Although we believe that we maintain a robust program of information security and controls and that none of the events that we have encountered to date have materially impacted us, ***we cannot be certain that the security measures and procedures we have in place*** to detect security incidents and protect sensitive data, including protection against unauthorized access and use by our employees, ***will be successful or sufficient*** to counter all current and emerging technological risks and threats.

(emphasis added).

47.    Rather than addressing known security problems, Fiserv actively conceals them. When another credit union sought to warn customers about their security problems, Fiserv retaliated with litigation threats. By silencing whistleblowers, Fiserv placed profit and reputation ahead of customer safety, deliberately misleading Cencap Federal and other financial institutions about the true risks of its services. Fiserv strives to keep its security failures under wraps by misleading its customers into continuing to entrust their confidential information with Fiserv while maintaining a high stock price, artificially inflating the value of its corporate goodwill, and continuing to receive payments from financial institutions.

31039315

48.     Indeed, Fiserv even sued one of its former customers—another not-for-profit credit union, Bessemer System Federal Credit Union, in an effort to try to keep the problems with Virtual Brank secret, after that credit union rejected Fiserv's demand to not inform other Fiserv customers about security problems impacting Virtual Branch.

49.     By intentionally failing to disclose or suppressing information about its security problems, Fiserv misled Cencap Federal, its members, and other Fiserv customers into using and continuing to use Fiserv's service offerings, thus providing Fiserv with ill-gotten gains, thwarting its competitors, and artificially fattening its stock price and goodwill. Fiserv has a particular interest in artificially increasing the value of its goodwill and intangible assets, as they represent a significant portion of Fiserv's total assets.

50.     As financial institutions, Cencap Federal has a continuing interest in ensuring that their members are secure and safeguarded from future breaches.

51.     Because Cencap Federal's core function is serving its members' financial needs, Cencap Federal is faced with increased costs of addressing Fiserv's poor security.

***Despite Fiserv's Actual Knowledge of Problems
with Virtual Branch Security and the Client360 Portal,
The System Has Remained Insecure and Jeopardized Cencap Federal***

52.     Fiserv was, and is, aware of the risks posed by its weak security controls and the extraordinarily sensitive nature of the personal member information it maintains, as well as the resulting impact that a data breach would have on a financial institution such as Cencap Federal.

53.     Multi-factor authentication is absent when accounts are first created on Virtual Branch, and the security questions created are illusory because there is no multi-factor authentication required to create security questions. Similarly, accessing Cencap Federal's Client360 portal requires only a username and a password.

17

54.    Under federal regulatory guidance, the Virtual Branch and Client360 single-factor authentication process is woefully inadequate. *See* FFIEC, "Authentication and Access to Financial Institutions services and Systems" at 6-7, https://www.fdic.gov/news/financial-institution-letters/2021/fil21055a.pdf ("Attacks against systems and users protected with single-factor authentication often lead to unauthorized access resulting in data theft or destruction, adverse impacts from ransomware, customer account fraud, and identity theft. Accordingly, use of single factor authentication as the only control mechanism has shown to be inadequate against these threats. Furthermore, single-factor authentication with layered security has shown to be inadequate for customers engaged in high-risk transactions and for high-risk users."). Other federal guidance confirms that single-factor authentication is a "low security method of authentication" that "provides attackers an easy way to gain access to the system" *See* U.S. Cybersecurity & Infrastructure Security Agency (CISA), "Capacity Enhancement Guide: Implementing Strong Authentication"                          at                          2 https://www.cisa.gov/sites/default/files/publications/CISA_CEG_Implementing_Strong_Authentication_508_1.pdf (noting a study of multi-factor authentication found that it "blocked 100 percent of automated bots, 99 percent of bulk phishing attacks, and 66 percent of targeted attacks")

55.    Unfortunately, Fiserv's approach to maintaining the privacy and security of its customer data was knowingly deficient, grossly negligent and reckless, or, at the very least, negligent. Fiserv failed to follow industry standard precautions in response to known risks, and Fiserv knew that its security controls were substandard and deficient.

56.    Cencap Federal now faces increased costs for surveillance and increased vigilance against fraudulent activity involving its members.

### *The Severe Impact on Cencap Federal and Its Members*

57.     Member data entrusted to Fiserv is extraordinarily sensitive and immensely valuable to identify thieves. Information compromised by Fiserv can be weaponized to commit fraud, drain accounts, and inflict lasting harms to members. Once exposed, this information can circulate indefinitely on the dark web, placing thousands of innocent people at continuous risk of identify theft, fraud, and personal distress.

58.     Criminals can also use Cencap Federal's member information for embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud, including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits. For example, the times and locations members use their debit cards can be used to stalk and victimize those individuals. A report from the United States Government Task Force on Identity Theft explains the harm befallen to Cencap Federal and its members:

> Businesses suffer most of the direct losses from ... identity theft because individual victims generally are not held responsible for fraudulent charges. Individual victims, however, also collectively spend billions of dollars recovering from the effects of the crime.
>
> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, monetary costs of identity theft include indirect costs to businesses for fraud prevention and mitigation of the harm once it has occurred (e.g., for mailing notices to consumers and upgrading systems). Similarly, individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit....
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close

existing bank accounts and open new ones, and dispute charges with individual creditors.[2]

59.    To put it into context, the FBI Internet Crime Complaint Center's 2024 Internet Crime Report reveals that, between 2020 and 2024, it received 4.2 million complaints related to various Internet scams impacting American citizens around the globe, amounting to a staggering $50.5 billion in reported losses, and an average of 836,000 complaints received per year. In 2024 alone, the crime categories of personal data breach, general data breach, credit card/check fraud, and identify theft accounted for $2.19 billion in losses. The average lost per complaint in 2024 was $19,372. *See* https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

60.    Stolen data can be used in a number of different ways. One of the most common is that it is offered for sale on the "dark web," a heavily encrypted part of the internet that makes it difficult for authorities to detect a website's location or owners. The dark web is not indexed by normal search engines such as Google and is accessible only by using a Tor browser (or similar tool), which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling items such as weapons, drugs, and member information. Sites on the dark web appear and disappear quickly, providing cover for illegal transactions.

61.    Once someone buys member information, it is then used to gain access to different areas of the victim's digital life, including financial accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

62.    In addition to member information that can be accessed, a hacked online banking account can be very valuable to cyber criminals for other attacks. Since online banking accounts

---

[2] The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan, Federal Trade Commission, 11 (April 2007).

31039315

are linked to other accounts (for example, to transfer funds between financial institutions), a hacked online banking account can serve as a gateway for additional criminal activity.

63.    The problems associated with identity theft are exacerbated by the fact that many identity thieves will commonly delay before exploiting stolen information, extending the threat of identity theft years beyond the initial breach. The stolen data may be listed for sale on the dark web years after the initial breach, enabling unauthorized individuals to purchase and exploit it long after the security incident has faded from immediate concern.

64.    Compounding this risk is the practice known as "dwell" by hackers, where unauthorized access remains undetected within a network for extended periods and amplifying long-term harm. During this time, cybercriminals can continue exploiting across multiple systems within the same network, gather additional sensitive information, and fortify their control over compromised data without triggering immediate detection. This latency often results in the theft going unnoticed until long after the initial breach, amplifying the potential for further exploitation.

65.    Because hackers can remain undetected for extended periods and delay the use of stolen information, the full scope of the breach may not be immediately apparent. Indeed, in order to protect its member information, Cencap Federal will need to remain vigilant against unauthorized use of its member information for years and decades to come.

### *Fiserv Attempts to Charge Punitive Termination Fees When Cencap Federal Seeks to Exit the Insecure Services*

66.    On or about May 28, 2025, counsel for Cencap Federal wrote to Fiserv (1) advising that Fiserv was in breach of the Master Agreement by, among other things, failing to use the same care and discretion to prevent unauthorized disclosure of information, and (2) requesting security audit records. **Exhibit 4** hereto is a true and correct copy of the May 28, 2025 letter.

67.     Counsel for Fiserv responded by letter dated May 30, 2025 disputing Fiserv's breach and instead demanding that Cencap Federal pay unreasonable and unwarranted termination fees. **Exhibit 5** hereto is a true and correct copy of the May 30, 2025 letter.

### *Fiserv's Misconduct Warrants Punitive Damages*

68.     Fiserv has repeatedly acted in bad faith and deceptively.

69.     As alleged above, Fiserv knew its data security measures were grossly inadequate by, at the absolute latest, reports of security problems coming to light, exposing Fiserv's lax and inadequate approach to data security. At that time, Fiserv was on notice that its systems were extremely vulnerable to attack—facts Fiserv already knew given its previous exposures and problems, and multiple past litigation involving Virtual Branch.

70.     In response to all of these facts, Fiserv failed to properly warn Cencap Federal and its members about these problems and, instead, openly represented that Fiserv had adequate security practices and protocols.

71.     Fiserv had an obligation to warn Cencap Federal that it and its members were easy targets for hackers and that Fiserv was not implementing appropriate measures to protect them and the safety of their information.

72.     Fiserv did not do these things. Instead, Fiserv willfully deceived warn Cencap Federal and its members by concealing the true facts concerning Fiserv's data security, which Fiserv was obligated to, and had a duty to, disclose. Fiserv made numerous representations following the prior data security vulnerabilities to assure its customers that their information was safe, and that Fiserv was dedicated to maintaining that security.

73.     Had Fiserv disclosed the true facts about its poor data security practices, Cencap Federal would have taken measures to protect itself. Cencap Federal justifiably relied on Fiserv to

provide accurate and complete information about its data security and processing of Cencap Federal's sensitive information, and Fiserv did not do so.

74.    Alternatively, given the security lapses and other problems in Fiserv's services and Fiserv's refusal to take measures to detect them, much less fix them, Fiserv simply should have shut down the services Cencap Federal was using and returned Cencap Federal information so that Cencap Federal could transition to its disaster recovery arrangements. Independent of any representations made by Fiserv, Cencap Federal justifiably relied on Fiserv to provide a service with at least minimally adequate measures to protect the confidentiality of Cencap Federal's information, and Cencap Federal justifiably relied on Fiserv to disclose facts that would undermine that reliance.

75.    Rather than ceasing to offer a clearly unsafe and defective service or disclosing to Cencap Federal that its services were unsafe and that information was exposed to theft on a grand scale, Fiserv continued to conceal information relating to the inadequacy of its security, including by threatening at least one other financial institution customer with litigation in an effort to pressure that customer to cover up and not inform other affected customers of Virtual Branch's security problems.

76.    Even though Fiserv had knowledge that its system was insecure, Fiserv has failed to properly address these issues, including by failing to put warn Cencap Federal and its members on notice of them.

77.    Fiserv acted in a wanton and reckless manner, maliciously, with a high degree of immorality, and in a manner showing such wanton dishonesty as to imply a criminal indifference to civil obligations.

23

78.    The damages inflicted on Cencap Federal and its members include paying Fiserv for services that were not properly performed, damage to Cencap Federal's business, being placed at an imminent, immediate, and continuing increased risk of being victimized by identity theft and fraud, and time and effort needed to mitigate the adverse actual and potential impact of Fiserv's acts, omissions, concealments, and misrepresentations, including providing increased security against and investigating fraudulent or inaccurate transactions, notification to government officials and affected members, increased costs associated with the activation of Cencap Federal's disaster recovery plan, cancelling and/or reissuing payment cards or payment card transactions, imposing withdrawal and transactional limits on accounts, losing interest revenue and fees due to reduced account usage, reputational harm to the institution, and associated legal and compliance costs. Furthermore, Cencap Federal is entitled to disgorge the unjust profits and ill-gotten gains Fiserv made in connection with the improper use of and failure to safeguard Cencap Federal's account records and information.

### *Cencap Federal's Claims Are Timely, as Both the Statute of Limitations and Contractual Limitations Period Have Been Tolled*

79.    Cencap Federal exercised reasonable diligence but could not discover Fiserv's misconduct earlier due to Fiserv's deliberate and active concealment.[3]

80.    Cencap Federal became aware of the harm caused by Fiserv's security deficiencies only recently, well within applicable limitations period.

---

[3] "As the discovery rule has developed, the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know what he is injured and by what cause." *Bessemer Sys. Fed. Credit Union v. Fiserv Sols., LLC*, 472 F. Supp. 3d 142, 168 (W.D. Pa. 2020) (quoting *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850, 858 (Pa. 2005)) (denying Fiserv' motion to dismiss the plaintiff credit union's fraudulent inducement claim as time-barred, relying on the discovery rule).

81.     Cencap Federal previously did not suspect, and had no reason to suspect, that Fiserv's products and services caused damages and harm.

82.     The highly technical nature of Fiserv's products and services prevented earlier detection of these serious cybersecurity problems.

83.     Fiserv maintained exclusive knowledge of the material defects and vulnerabilities designed and implemented into its products and services, actively misleading Cencap Federal.

84.     In addition, Fiserv's fraudulent concealment and/or other tortious conduct has tolled the running of any statute of limitations.

85.     Fiserv was actually aware of the material defects in its software, security vulnerabilities in its Virtual Branch website and the Client360 portal, and its failure to comply with regulatory requirements. Fiserv also knowingly, affirmatively, and actively concealed from Cencap Federal the risks associated with the defects of its products and services, and that these defects caused damages and harm to Cencap Federal.

86.     Fiserv's purpose in concealing these facts was to induce Cencap Federal to continue relying on its services and to delay Cencap Federal's discovery of its claims. By concealing material information, Fiserv sought to avoid early detection of its misconduct and to prevent Cencap Federal from initiating legal action within the applicable limitations period.

87.     Fiserv committed tortious and/or fraudulent acts that continue to this day. As of the date of this Complaint, Fiserv still has not disclosed, and continues to conceal, that it designed and implemented insecure features into its products and services, and that the representations it made about the security of its services are false. Despite its knowledge of the defects and their attendant risks, Fiserv continues to market its products and services to financial institutions while simultaneously omitting the disclosure of known and foreseeable harms.

88.     Cencap Federal was unaware and could not have reasonably known or learned through reasonable diligence that it had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Fiserv's acts and omissions.

89.     Moreover, Fiserv's obligations under the Master Agreement are ongoing and include the continued implementation of appropriate information security measures, adherence to regulatory requirements, and the exercise of good faith and fair dealing in not exposing Cencap Federal to vastly greater harm than bargained for and well outside commercially reasonable norms. Each act of non-compliance with these contractual obligations renewed the limitations period under the continuing duty doctrine.

90.     For the foregoing reasons, Fiserv is estopped from relying on any statutes of limitation or repose, or other time-based defenses in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule, the continuing duty doctrine, and by Fiserv's active concealment with respect to all claims against it.

### FIRST CLAIM FOR RELIEF:
### Breach of Contract / Promissory Estoppel:
### Fiserv Solutions' Master Agreement
### (Against Fiserv Solutions Only)

91.     Cencap Federal repeats the allegations in the preceding paragraphs.

92.     The Master Agreement sets forth valid and binding obligations upon Fiserv Solutions. Alternatively, to the extent the Master Agreement is not a valid or enforceable contract, it is enforceable under principles of promissory estoppel because the promises contained in the Master Agreement were reasonably relied on by Cencap Federal and its members to their detriment in deciding whether to transact business with Fiserv Solutions and furnish sensitive their sensitive personal and banking information to Fiserv Solutions.

31039315

93.    In addition to the express terms of the Master Agreement, the implied covenant of good faith and fair dealing applies to the Master Agreement. When reasonably read, the terms of the Master Agreement imply certain other obligations that are necessary to vindicate the parties' apparent intentions and reasonable expectations. By entering into the Master Agreement, Fiserv Solutions impliedly covenanted that it would act in good faith, including by providing services suitable for the proper functioning of a federally regulated credit union.

94.    Cencap Federal has duly performed all relevant obligations and satisfied all pertinent conditions required of it under the Master Agreement, except for those that were waived or excused by Fiserv Solutions.

95.    Fiserv Solutions has materially breached its obligations to Cencap Federal by failing to perform as promised, repudiating its obligations, and breaching the implied covenant of good faith and fair dealing by, among other things:

    a.    Fiserv Solutions breached Section 3(b) of the Master Agreement, which required Fiserv Solutions to prevent unauthorized disclosure of Cencap Federal's information under the standards set forth in the Master Agreement.

    b.    Fiserv Solutions breached Section 4(a) of the Master Agreement, which required Fiserv Solutions to implement and maintain an information security program that, among other things, protected the security and confidentiality of Cencap Federal's information. Among other things, Fiserv Solutions placed Cencap Federal's information on the insecure Virtual Branch website and Client360 portal without proper authentication and security controls.

    c.    Fiserv Solutions breached Section 4(b) of the Master Agreement, which required Fiserv Solutions to provide Cencap Federal with "a summary of Fiserv's written

Information security plan for the applicable Services received by" Cencap Federal. Fiserv did not provide Cencap Federal any of these records after receiving Cencap Federal's written demand.

d.      Fiserv Solutions breached Section 6(a) of the Master Agreement, under which Fiserv Solutions warranted that "it complies with all laws and regulations directly and unambiguously applicable to Fiserv in the performance of its obligations as a technology solutions provider under this Agreement." Fiserv did not comply with all such requirements.

e.      Fiserv Solutions breached Section 3(d) of the ASP Services Exhibit to the Master Agreement, which required Fiserv Solutions to provide Cencap Federal with "a copy of [Fiserv Solutions's] most recent security certification, if any, for the applicable Fiserv service center providing such Services." Fiserv did not provide Cencap Federal any of such security certification after receiving Cencap Federal's written demand.

f.      Fiserv Solutions breached the service warranties in Section 3(e) of the ASP Services Exhibit to the Master Agreement, including the warranties of conformity to specifications and due care.

g.      Fiserv Solutions breached Section 3(f) of the ASP Services Exhibit to the Master Agreement, Fiserv Solutions was obligated to provide Cencap Federal with "a copy of [an] independent audit report of the Fiserv service center providing Services . . ." Fiserv did not provide Cencap Federal any such independent audit report after receiving Cencap Federal's written demand.

h.  Fiserv Solutions breached Section 5(c) of the ASP Services Exhibit to the Master Agreement, which requires Fiserv Solutions to "test the Disaster Recovery Plan periodically," and upon Cencap Federal's request, to make "test results [] available to [Cencap Federal]'s management, regulators, auditors, and insurance underwriters." Fiserv Solutions did not perform such test or provide any such test results to Cencap Federal after receiving Cencap Federal's written demand.

i.  Fiserv violated the Virtual Branch Services Schedule to the ASP Services Exhibit by failing to implement multi-factor authentication services contracted by Cencap Federal.

j.  Fiserv Solutions violated N.Y. General Obligations Law § 5-903 by purporting to effectuate an automatic renewal of the Master Agreement without providing the required personal or certified mail notice to Cencap Federal beforehand.

k.  Fiserv Solutions has demonstrated a lack of good faith and fair dealing by refusing to promptly provide services for the suitable and proper protection of credit union members, and exposing Cencap Federal and its members to vastly greater harm than Cencap Federal had bargained for and well outside of commercially reasonable norms, and issuing invoices and payment demands to Cencap Federal that overstated the amount Cencap Federal owes and causing Cencap Federal to remit payments to Fiserv Solutions that are not justly due to Fiserv Solutions or supported by any good-faith basis.

96.  Fiserv Solutions' contract breaches were caused by bad faith and its willful, malicious, reckless, or grossly negligent conduct, were not reasonably contemplated by Cencap Federal, were so unreasonable as to constitute an abandonment of the Master Agreement, and were

29

breaches of fundamental obligations. Indeed, despite a pattern of recurring and known breaches, Fiserv Solutions was grossly negligent and reckless, failed to use a slight degree of care, and acted with complete disregard for Cencap Federal's rights. Although Fiserv Solutions had actual knowledge that its system compromised the security of Cencap Federal's information, Fiserv Solutions failed to address properly these security problems and actively concealed them from Cencap Federal.

97.    As a result of Fiserv Solutions' breach of its promises, Cencap Federal and its members have suffered and will continue to suffer damages and harm.

**SECOND CLAIM FOR RELIEF:**
**Breach of Contract / Promissory Estoppel:**
**Fiserv's Privacy Notice**

98.    Cencap Federal repeats the allegations in the preceding paragraphs.

99.    Fiserv, Inc. utilizes a publicly available "Privacy Notice," which sets forth Fiserv's responsibilities with respect to the security and protection of its customer data. The Privacy Notice applies to Fiserv, Inc. and all of its subsidiaries and affiliates, including Fiserv Solutions. A copy of the current Privacy Notice is available at https://www.fiserv.com/en/about-fiserv/privacy-notice.html.

100.    Section 6 of the Privacy Notice attests as follows:

> We have put in place appropriate security measures to prevent your personal data from being accidentally lost, used or accessed in an unauthorised way, altered or disclosed. In addition, we limit access to your personal data to those employees, agents, contractors and other third parties who have a business need to know. They will only process your personal data on our instruction and they are subject to a duty of confidentiality. We maintain annual compliance with global Payment Card Industry Data Security Standard (PCI DSS) adopted by the payment card brands for all companies that process, store or transmit cardholder data. We have put in place procedures to deal with any suspected personal data breach and will notify you and any applicable regulator of a breach where we are legally required to do so.

101.    The Privacy Notice imposes valid and binding contractual obligations on Fiserv. Alternatively, to the extent the Privacy Notice is not a valid or enforceable contract, it is enforceable under principles of promissory estoppel because the promises contained in the Privacy Notice were reasonably relied upon by Cencap Federal to its detriment. Cencap Federal and its members relied on the Privacy Notice to their detriment in deciding whether to transact business with Fiserv and furnish sensitive their sensitive personal and banking information to Fiserv.

102.    Fiserv breached its obligations under the Privacy Notice and violated its promises to Cencap Federal by failing to safeguard Cencap Federal's information as promised.

103.    As a result of Fiserv's breaches of its promises, Cencap Federal and its members have suffered and will suffer damages and irreparable harm.

**THIRD CLAIM FOR RELIEF:**
**Connecticut Uniform Trade Secrets Act**

104.    Cencap Federal repeats the allegations in the preceding paragraphs.

105.    Cencap Federal is the owner of all right, title, and interest in and to certain valuable trade secrets relating to its business operations. Cencap Federal's trade secrets include, but are not limited to, the identities and contact information of its members, the compilation of members' financial history and transactions as reflected on account records and information, and credit information.

106.    Other than through unlawful acquisition, the trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

107.    Cencap Federal has taken reasonable measures to maintain the secrecy of its trade secrets, including insisting that Fiserv protect their secrecy pursuant to the Master Agreement and the Fiserv Privacy Notice.

108.     Cencap Federal has invested substantial resources in developing and protecting its trade secrets. Cencap Federal's trade secrets provide it with economic advantages over its competitors.

109.     Fiserv knew or should have known that the trade secrets at issue comprised Cencap Federal's trade secrets.

110.     Fiserv misappropriated Cencap Federal's trade secrets by acquiring them through improper means through misrepresenting to Cencap Federal the existence and nature of Fiserv's security controls. Had Fiserv provided truthful information to Cencap Federal, it would not have furnished its trade secrets to Fiserv and allowed, and continued to allow, those trade secrets to be stored and accessible on Fiserv's insecure Virtual Branch website and Client360 portal.

111.     Fiserv has also misappropriated Cencap Federal's trade secrets by using them without its express or implied consent. Fiserv's improper use of Cencap Federal's trade secrets includes using them contrary to Cencap Federal's instructions and failing to return the trade secrets to Cencap Federal as directed and instead using them for Fiserv's own commercial advantage.

112.     Fiserv has also misappropriated Cencap Federal's trade secrets by allowing them to be disclosed without Cencap Federal's express or implied consent, including by making the trade secrets available to hackers and other individuals not authorized to acquire the trade secrets.

113.     At the time of Fiserv's use and disclosure of Cencap Federal's trade secrets, Fiserv knew or had reason to know that it acquired the trade secrets by improper means, under circumstances giving rise to a duty to maintain their secrecy or limit their use, from or through a person who had a duty to Cencap Federal to maintain the trade secrets' secrecy and limit their use, or by mistake prior to a material change of Fiserv's position.

114.    Fiserv's misappropriation of Cencap Federal's trade secrets was done for its own commercial advantage, including for the purposes of preventing Cencap Federal from using vendors that are competitive with Fiserv and causing Cencap Federal to enter into transactions that provided Fiserv with additional and excessive profits, and collecting amounts that were not justly due to Fiserv.

115.    Fiserv's misappropriation of Cencap Federal's trade secrets was carried out in a knowing, willful, reckless, and malicious manner in disregard and violation of Cencap Federal's rights.

116.    As a direct and proximate result of Fiserv's misappropriation of Cencap Federal's trade secrets, Cencap Federal and its members have suffered and will continue to suffer damages and harm.

117.    Fiserv's misappropriation was willful and malicious, entitling Cencap Federal to exemplary damages under Conn. Gen. Stat. §35-53 and reasonable attorneys' fees under Conn. Gen. Stat. § 35-53.

**FOURTH CLAIM FOR RELIEF:**
**Defend Trade Secrets Act**

118.    Cencap Federal repeats the allegations in the preceding paragraphs.

119.    Cencap Federal's trade secrets are related to products and services used in and intended to be used in interstate and foreign commerce.

120.    Fiserv's acts constitute violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836.

121.    Fiserv's misappropriation was willful and malicious, entitling Cencap Federal to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

122.    As a direct and proximate result of Fiserv's misappropriation of Cencap Federal's trade secrets, Cencap Federal and its members have suffered and will continue to suffer damages and harm.

## FIFTH CLAIM FOR RELIEF:
### Negligence / Gross Negligence

123.    Cencap Federal repeats the allegations in the preceding paragraphs.

124.    Fiserv owed a duty to Cencap Federal because in affirmatively collecting, storing, and processing sensitive personal and financial information on internet-accessible computer systems, Fiserv owed a duty to Cencap Federal and its members to exercise reasonable care under the circumstances, which includes using reasonable measures to protect the information from the foreseeable risk of a data breach, unauthorized third-party access, or loss or alteration. Troves of highly sensitive personal and financial data are stored on internet-accessible systems administered by Fiserv and are obvious targets for cyber criminals. A reasonable entity in Fiserv's position should foresee that a failure to use reasonable security measures can lead to serious consequences. Accordingly, in collecting, storing, and processing Cencap Federal's information on internet-accessible computer systems, Fiserv owed a duty to exercise reasonable care to protect Cencap Federal against unreasonable risks of harm arising out of those acts. Fiserv, as the entity with custody of that information, was the only party that realistically could ensure that its systems were sufficient to properly handle and protect the sensitive information that Cencap Federal entrusted to Fiserv.

125.    Fiserv also owed a duty to Cencap Federal because Fiserv was certain that Cencap Federal would suffer, and Cencap Federal did in fact suffer and will continue to suffer, monetary and reputational injury.

126.    Fiserv also owed a duty to Cencap Federal because there is a close connection between Fiserv's conduct and Cencap Federal's injuries insofar as Cencap Federal would not have been injured but for Fiserv's negligence.

127.    Fiserv also owed a duty to Cencap Federal because there is a strong public policy interest in banking, given that it is an essential service on which consumers must rely, and preventing Fiserv from behaving in such a reckless, careless, and negligent fashion and from shifting blame to others.

128.    Fiserv further owed a duty to Cencap Federal because the burden on Fiserv is minimal and the consequences to the community are positive as a result of imposing a duty on Fiserv under these circumstances.

129.    Fiserv also owes a duty because, upon information and belief, there is insurance available for this risk. Moreover, Fiserv, which reported annual revenues in excess of $10 Billion, can afford any damages awarded by the trier of fact.

130.    Through its acts and omissions, Fiserv failed to act with the care that a reasonably prudent person would exercise in the same or similar circumstances.

131.    Fiserv was grossly negligent and reckless, failed to use even a slight degree of reasonable care, and acted with complete disregard for Cencap Federal's rights.

132.    Without limitation, Fiserv failed to institute appropriate protective measures to maintain the safety and security of the confidential information to which it was entrusted.

133.    Fiserv also acted negligently because it had a duty to warn Cencap Federal of foreseeable dangers under the circumstances, but failed to reasonably and appropriately inform or warn Cencap Federal of at least the following:

    a.    that Fiserv had failed to enact appropriate measures to protect the safety of Cencap Federal's information;

    b.    that in the absence of such measures, Fiserv would permit unauthorized individuals to access, delete, or modify Cencap Federal's information;

    c.    that Cencap Federal should independently take any protective measures to ensure that the safety, security, and accuracy of its information would be maintained; and

    d.    that Cencap Federal's information had been, or was reasonably believed to have been, compromised.

134.    As a direct and proximate result of Fiserv's negligence, Cencap Federal and its members have suffered and will continue to suffer damages and harm.

**SIXTH CLAIM FOR RELIEF:**
**Fraud / Fraudulent Inducement**

135.    Cencap Federal repeats the allegations in the preceding paragraphs.

136.    Fiserv fraudulently misrepresented its data security practices, knowingly concealing its profound deficiencies. Relying on these deceptive assurances, Cencap Federal entrusted Fiserv with sensitive information, a trust Fiserv intentionally violated.

137.    Among other deceptive representations, Fiserv, Inc. utilizes a publicly available "Privacy Notice," which contains representations of existing fact regarding the security controls Fiserv claims are in place to protect its customer data. The Privacy Notice applies to Fiserv, Inc. and all of its subsidiaries and affiliates, including Fiserv Solutions. A copy of the current Privacy Notice is available at https://www.fiserv.com/en/about-fiserv/privacy-notice.html.

138.    Section 6 of the Privacy Notice makes a representation of fact that Fiserv has "in place appropriate security measures to prevent…personal data from being lost, used or accessed in an unauthorised way, altered or disclosed."

139.    Fiserv lied about the existence and nature of its security measures. Contrary to Fiserv's representation, Fiserv did not have appropriate security measures in place to prevent Cencap Federal's personal data from being lost, used, or accessed in an unauthorized way, altered or disclosed.

140.    Fiserv engaged in particularly egregious fraud by specifically marketing and accepting payment for two-factor authentication services while deliberately failing to implement them. Cencap Federal specifically contracted for and paid additional fees for two-factor authentication protection on its Virtual Branch platform, as documented in the Virtual Branch Services Schedule to the ASP Services Exhibit of the Master Agreement. Despite collecting these fees, Fiserv knowingly left the Virtual Branch platform completely unprotected by two-factor authentication, exposing member accounts to unauthorized access given Fiserv's failure to implementing this security control.

141.    Fiserv's failure to implement two-factor authentication constitutes both fraud and fraudulent misrepresentation. By accepting payment for security services it had no intention of providing, Fiserv deliberately deceived Cencap Federal about the actual level of protection afforded to its confidential information. Fiserv intentionally and willfully defrauded Cencap Federal while placing thousands of members at risk.

142.    Even after being directly confronted about this fraud, Fiserv continues the deception. On May 28, 2025, counsel for Cencap Federal sent a demand letter to Fiserv explicitly identifying the failure to implement two-factor authentication despite receiving payment for such services. Rather than implementing the promised security measures, Fiserv responded by disputing its breach and demanding unwarranted termination fees.

31039315

143.    Fiserv's continued failure to provide two-factor authentication after being put on notice of this issue demonstrates the fraudulent nature of the original transaction. A company acting in good faith would have immediately implemented the security measures upon discovering an oversight. Instead, Fiserv's response confirms that its original acceptance of payment without even intending to hold its end of the bargain was intentional.

144.    Further, independent of any specific misrepresentations made by Fiserv, Cencap Federal and its members reasonably and justifiably relied on Fiserv to provide a service with at least minimally adequate measures to protect the confidentiality of Cencap Federal's information and Cencap Federal is entitled to presume, and did expect, that Fiserv would take appropriate measures to keep Cencap Federal's information safe. Fiserv did not disclose at any time to Plaintiff that Cencap Federal's information was vulnerable to hackers because Fiserv's security was inadequate, and Fiserv was the only one in possession of that material information, which it had a duty to disclose. Fiserv misrepresented, both by affirmative conduct and by omission, the security of its systems, and their ability to authenticate authorized users and to safely store and process Cencap Federal's information. Fiserv also engaged in deception by failing to implement reasonable and appropriate security measures or to follow industry standards and credit union regulatory guidelines for data security, by actively concealing information about Fiserv's security problems (including by threatening another Fiserv customer who uncovered a Virtual Branch security problem with litigation) and by failing to comply with its own policies and agreements. Cencap Federal justifiably relied on Fiserv, which had a duty to disclose material facts that would undermine Cencap Federal's reasonable reliance on these subjects. Fiserv has special knowledge of information regarding these subjects that is not reasonably ascertainable by Cencap Federal.

31039315

145.    Cencap Federal and its members reasonably and justifiably relied on Fiserv's misrepresentations, concealments, acts, and omissions to their detriment by, among other things, entering into the Master Agreement and other transactions with Fiserv, making payments to Fiserv, and furnishing confidential information to Fiserv.

146.    Fiserv knew or should have known that its misrepresentations, concealments, acts, and omissions were false or recklessly made without regard to their falsity, they were material to Cencap Federal and its members, and made with the intent of misleading them into relying upon them, and they did so justifiably rely. Further, the falsity of Fiserv's misrepresentations, concealments, acts, and omissions were within Fiserv's peculiar knowledge and could not have been reasonably discovered by Cencap Federal.

147.    By Fiserv's misrepresentations, concealments, acts, and omissions, Fiserv defrauded Cencap Federal and its members, including fraudulently inducing Cencap Federal to contract with Fiserv Solutions.

148.    As a direct and proximate result of Fiserv's fraud, Cencap Federal and its members have suffered and will continue to suffer damages and harm.

## SEVENTH CLAIM FOR RELIEF:
### Bailment

149.    Cencap Federal repeats the allegations in the preceding paragraphs.

150.    Cencap Federal has a property interest in its information. These records and information are stored in a tangible format in information technology systems or other media administered by Fiserv.

151.    Cencap Federal's property interest in the foregoing assets arises from its ownership of such property. Alternatively, to the extent such property is owned by Cencap Federal's members, those members have authorized Cencap Federal to possess such property.

39

152.     In a bailment intended to mutually benefit Cencap Federal, and Fiserv, Fiserv has accepted delivery of Cencap Federal's account records and information and became a bailee of such property, thereby undertaking duties, independent of any contractual duty, to account for such property and to care for it.

153.     As part of this bailment, it was understood that Fiserv would use such property for the limited purposes authorized by Cencap Federal, safeguard the property, and return it.

154.     Cencap Federal has demanded that Fiserv return such property.

155.     Fiserv breached its duty as a bailee by refusing to return Cencap Federal's account records and information, compromising their confidentiality, misusing them, interfering with them, and otherwise dealing with them in a manner inconsistent with Fiserv's bailee duties and the superior possessory rights of Cencap Federal.

156.     Fiserv's violation of its bailee duties was done without Cencap Federal's consent and without lawful justification.

157.     As a direct and proximate result of Fiserv's breach of its bailee duties, Cencap Federal and its members have suffered and will continue to suffer damages and harm.

## EIGHTH CLAIM FOR RELIEF:
### Conversion

158.     Cencap Federal repeats the allegations in the preceding paragraphs.

159.     Cencap Federal has a property interest in its information. These records and information are stored in a tangible format in information technology systems or other media administered by Fiserv.

160.     Cencap Federal's property interest in the foregoing assets arises from its ownership of such property. Alternatively, to the extent such property is owned by Cencap Federal's members, those members have authorized Cencap Federal to possess such property.

161.    Cencap Federal has superior possessory rights in these assets than Fiserv.

162.    Cencap Federal has demanded that Fiserv return such property.

163.    Fiserv converted Cencap Federal's assets by acquiring possession of them through fraud, refusing to return Cencap Federal's account records and information, compromising their confidentiality, misusing them, interfering with them, and otherwise dealing with them in a manner inconsistent with the superior possessory rights of Cencap Federal.

164.    Fiserv's conversion of Cencap Federal's assets was done without Cencap Federal's consent and without lawful justification.

165.    As a direct and proximate result of Fiserv's conversion of Cencap Federal's assets, Cencap Federal and its members have suffered and will continue to suffer damages and harm.

**NINTH CLAIM FOR RELIEF:**
**Unjust Enrichment**

166.    Cencap Federal repeats the allegations in the preceding paragraphs.

167.    As a result of Fiserv's unjust and unconscionable misconduct, Fiserv has induced Cencap Federal to furnish Cencap Federal's account records and information and to make payments not justly due to Fiserv.

168.    Fiserv knowingly avoided substantial costs by failing to implement the security controls and compliance measures required under the Master Agreement. Specifically, Fiserv's decision to place Cencap Federal's information on the Virtual Branch website and the Client360 portal without proper authentication and security controls enabled Fiserv to bypass industry-standard cybersecurity investments and regulatory compliance expenditures. These avoided costs include, but are not limited to, expenditures related to multi-factor authentication and other security controls, security audits, and regulatory compliance controls. By withholding these necessary

investments, Fiserv effectively shifted the financial burden and the resulting risks onto Cencap Federal, allowing Fiserv to unjustly retain the benefits of these cost savings.

169.    In addition to the cost savings from its failure to meet its obligations, Fiserv has also been unjustly enriched through overpayments made by Cencap Federal for services that were either improperly performed or entirely unperformed. These payments were made under the false representation that Fiserv had adequately secured member information, maintained compliance with regulatory requirements, and delivered services according to the specifications agreed upon in the Master Agreement. In reality, Fiserv's substandard performance and failure to disclose material defects in its platforms rendered these payments unjustified.

170.    As a result of this misconduct, Cencap Federal has conferred a financial benefit upon Fiserv in the form of both avoided costs and unwarranted payments for deficient and non-performed services. Fiserv has been, and will continue to be, unjustly enriched at Cencap Federal's expense, and under circumstances that would make it unjust and inequitable for Fiserv to retain its unjustly earned economic benefits.

171.    Accordingly, equity and good conscience require that Fiserv make restitution to Cencap Federal, including disgorging the unjust profits and ill-gotten gains Fiserv made in connection with the improper use of and failure to safeguard Cencap Federal's account records and information.

## TENTH CLAIM FOR RELIEF:
### Declaratory Relief

172.    Cencap Federal repeats the allegations in the preceding paragraphs.

173.    Genuine disputes exist between the parties concerning the Master Agreement and its existence, meaning, enforceability, and applicability, and that affect the highly sensitive personal and financial information of Cencap Federal's members. Cencap Federal thus seeks

42

declaratory relief on its own behalf and on behalf of its members. This Court's declarations of the parties' rights would resolve the legal relations of the parties to justiciable controversies.

174.    **Unenforceability of Master Agreement's Exculpatory and Limitation-of-Liability Provisions (Public Policy).** Cencap Federal is entitled to a declaration that the exculpatory and limitation-of-liability provisions in the Master Agreement are unenforceable because they purport to allow Fiserv to exempt itself from liability for damages caused by its grossly negligent, intentional, fraudulent, tortious, or other conduct for which an exculpatory provision or a limitation-of-liability provision is against public policy.

175.    **Fiserv Solutions' Defective Purported Automatic Renewal of the Master Agreement (N.Y. General Obligations Law § 5-903).** Cencap Federal is entitled to declaration that pursuant to N.Y. General Obligations Law § 5-903, the Master Agreement is unenforceable by Fiserv Solutions because it failed to give the statutorily required notice to Cencap Federal before purporting to effectuate an automatic renewal of the Master Agreement.

176.    **No Obligation to Pay Early Termination Fees, Liquidated Damages, Deconversion, or Post-Termination Fees (Contract Defenses and Public Policy).** Cencap Federal is entitled to declarations that it has no obligation to pay Fiserv Solutions early termination fees, liquidated damages, "deconversion," or other post-termination fees because of the following:

   a.    Fiserv Solutions has no right to enforce the Master Agreement due to its uncured material breaches, fraudulent inducement, fraudulent performance, failure of consideration, commercial impracticability, frustration of purpose, and violation of N.Y. General Obligations Law § 5-903.

b.     The fees at issue, other than liquidated damages, are not quantified in the Master Agreement and therefore unenforceable under the doctrine of indefiniteness and because they are not reasonable.

c.     The early termination fees or liquidated damages provisions are unenforceable in a renewal term of the Master Agreement. The Master Agreement contemplated an initial term, during which Cencap Federal paid and Fiserv Solutions received the complete economic benefit of the parties' bargain, including recurring fee revenue. Fiserv Solutions' attempt to impose early termination fees or liquidated damages during a renewal term is improper because the purpose of the liquidated damages clause (if valid during the initial term) was to compensate Fiserv Solutions for unrecovered upfront investments. In the renewal term, those investments have already been recouped in full or substantially recouped, and the clause serves no compensatory function. The liquidated damages provision is not calibrated to reflect any actual damages arising from an early termination during a renewal term. The same amount is demanded regardless of whether the Master Agreement is terminated in an initial term or renewal term. The formula—80% of all fees remaining in the term—creates a perverse and unreasonable result. Had the parties chosen not to renew at the conclusion of the initial term, no liquidated damages would have applied. Yet if the relationship ended just one day after, Fiserv Solutions would claim entitlement to liquidated damages in the millions. This arbitrary disparity renders the clause punitive in nature, unrelated to any reasonable forecast of actual damages, and unenforceable as a matter of law. The provision fails to be enforceable because it imposes a penalty rather than approximating

44

actual damages, does not decrease or scale based on the elapsed term, bears no reasonable relationship wo Fiserv Solutions' actual damages, and seeks to unjustly enrich Fiserv Solutions by awarding a windfall for services not rendered.

d.   The early termination fees or liquidated damages provisions are unenforceable penalties because they purport to entitle Fiserv Solutions to payment without regard to Fiserv's own wrongful conduct, and without regard to the substantial independent reasons why Cencap Federal may seek to terminate the Master Agreement to ensure its members are properly protected. The only legitimate purpose of such provisions would be to compensate for actual harm that is difficult to quantify. But if such provisions coerce action or punish—as they do here—they are unenforceable penalties. The plain purpose of these provisions is to coerce Cencap Federal into maintaining its relationship with Fiserv Solutions. Such provisions are incredibly punitive because Fiserv has demanded that Cencap Federal pay these fees even though Fiserv has engaged in misconduct. Moreover, even if these provisions are not unenforceable penalties, to the extent Fiserv relies on them to seek indemnification for or recover amounts incurred as a result of its own wrongful acts, such provisions are unenforceable under New York law.

## ELEVENTH CLAIM FOR RELIEF:
### Rescission of Master Agreement
### (Against Fiserv Solutions Only)

177.    Cencap Federal repeats the allegations in the preceding paragraphs.

178.    Cencap Federal may have the Master Agreement rescinded due to Fiserv's breaches. The breaches are so material, willful, substantial, and fundamental that they have defeated the object of the parties in making the Master Agreement. These breaches have left

45

Cencap Federal in a position substantially different from what the parties intended at the time they entered into the Master Agreement.

179.    Cencap Federal may have the Master Agreement rescinded because Fiserv misrepresented to Cencap Federal the existence and nature of Fiserv's security controls. These representations were material to Cencap Federal, and Cencap Federal reasonably relied on them in deciding whether to enter into and continue performing under the Master Agreement, which did not disclaim reliance on these types of specific representations, and the falsity of Fiserv's representations was within Fiserv's peculiar knowledge and could not have been reasonably discovered by Cencap Federal.

180.    Cencap Federal may have the Master Agreement rescinded due to commercial impracticability and frustration of purpose because unforeseeable events not caused by Cencap Federal have altered the essential nature of the Master Agreement, and Cencap Federal has been unable to obtain its expected bargain from Fiserv.

181.    Cencap Federal has no adequate remedy at law. Accordingly, this Court should rescind the Master Agreement.

### <u>TWELFTH CLAIM FOR RELIEF:</u>
**Injunction**

182.    Cencap Federal repeats the allegations in the preceding paragraphs.

183.    Fiserv has violated Cencap Federal's rights to the detriment of Cencap Federal and its members, and future violations of Cencap Federal's rights and harm to its members are threatened and imminent.

184.    Cencap Federal has no adequate remedy at law, an injunction is necessary to prevent Cencap Federal and its members from suffering irreparable injury, and the equities favor such relief.

46

## JURY TRIAL DEMAND

Cencap Federal requests a trial by jury of all issues so triable.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff Cencap Federal, on behalf of itself and its members, request that the Court grant the following relief:

(i)    enter judgment for all damages allowed by law—including, without limitation, compensatory, consequential, incidental, reliance, restitutionary, statutory, and punitive—in amounts to be determined at trial;

(ii)    award Cencap Federal its attorneys' fees and costs, and the maximum prejudgment and postjudgment interest allowed by law;

(iii)    declare the parties' rights and the rights of Cencap Federal's members;

(iv)    disgorge Fiserv's ill-gotten gain and unjustly earned profits;

(v)    rescind the Master Agreement;

(vi)    issue an injunction to prevent Cencap Federal and its members from suffering or continuing to suffer harm; and

(vii)    award any further relief that may be necessary to achieve justice.

Dated: June 5, 2025                    Respectfully submitted,

                                       BARCLAY DAMON LLP

                                       By: */s/ Brian D. Rich*
                                           Charles J. Nerko*
                                           Brian D. Rich
                                           Matthew J. Smith*
                                           Xun Chen*
                                       1270 Avenue of the Americas, Suite 501
                                       New York, NY 10020
                                       212.784.5800
                                       cnerko@barclaydamon.com
                                       brich@barclaydamon.com
                                       msmith@barclaydamon.com

31039315

xchen@barclaydamon.com

*Attorneys for Plaintiff*
*Cencap Federal Credit Union,*
*on behalf of itself and its members*

* Not admitted in D. Conn; *pro hac vice* application to be filed

48