## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CENCAP FEDERAL CREDIT UNION,

       Plaintiff,

v.

FISERV SOLUTIONS, LLC f/k/a
FISERV SOLUTIONS, INC. and
FISERV, INC.,
       Defendants.

Case No. 3:25-CV-00913-VDO

## OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND EXPEDITED DISCOVERY

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES...................................................................................iii

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................ 4

    I.     THE MASTER AGREEMENT AND THE PARTIES' THIRTEEN-YEAR RELATIONSHIP WITHOUT A DATA SECURITY ISSUE.................................. 4

    II.    CLIENT360 EMPLOYS MULTI-FACTOR AUTHENTICATION UNLESS CENCAP TURNED IT OFF.................................................................. 6

    III.   VIRTUAL BRANCH IS SECURE AGAINST BRUTE FORCE ATTACKS AND VIRTUAL BRANCH'S LAYERED SECURITY MEASURES PROVIDE ALL THAT CENCAP HAS PAID FOR. ....................... 8

        A.    VIRTUAL BRANCH EMPLOYS MULTIPLE SECURITY MEASURES AGAINST BRUTE FORCE ATTACKS AT ENROLLMENT........................................................................................ 10

        B.    AS CONTRACTED, FISERV DEPLOYED INTELLIGENT AUTHENTICATION AND OTHER LAYERED SECURITY MEASURES FOR CENCAP IN VIRTUAL BRANCH.......................... 13

        C.    FISERV OFFERED A SECURITY ENHANCEMENT CALLED "SECURE NOW" TO CENCAP, WHICH CENCAP DECLINED. ........ 14

    IV.   CENCAP PRECIPITATED THIS DISPUTE WITH A MANUFACTURED CLAIM OF "MATERIAL BREACH" DESPITE THE LACK OF ANY ACTUAL OR THREATENED SECURITY ISSUE IN ORDER TO BYPASS ITS DISPUTE RESOLUTION OBLIGATIONS AND GENERATE PUBLICITY. ................................................................................. 14

ARGUMENT ...................................................................................................... 17

    I.     CENCAP IMPROPERLY SEEKS A MANDATORY INJUNCTION THAT CANNOT BE GRANTED THROUGH A TEMPORARY RESTRAINING ORDER. .................................................................................. 19

    II.    CENCAP CANNOT MAKE EVEN THE RUDIMENTARY SHOWING REQUIRED FOR A TRO OR PRELIMINARY INJUNCTION, GIVEN THE ABSENCE OF IRREPARABLE (OR ANY) INJURY AND THE LACK OF ANY REALISTIC POSSIBILITY OF SUCCESS ON THE MERITS.................................................................................................... 20

i

       A.       CENCAP'S SPECULATION ABOUT "LAX SECURITY" FAILS TO ESTABLISH IRREPARABLE HARM. .............................................. 21

       B.       CENCAP HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS, MUCH LESS CLEAR ENTITLEMENT TO THE RELIEF REQUESTED. ............................... 25

       C.       THE INTERIM RELIEF THAT CENCAP SEEKS IS NOT REASONABLY FEASIBLE OR PRACTICAL AND WOULD IMPOSE AN UNNECESSARY AND UNFAIR HARDSHIP ON FISERV.................................................................................................. 26

    III.    CENCAP INAPPROPRIATELY SEEKS EXPEDITED DISCOVERY THAT IS TANTAMOUNT TO AN ENTERPRISE-WIDE FISHING EXPEDITION. ..................................................................................................... 29

CONCLUSION.......................................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bano v. Union Carbide Corp.*,
   361 F.3d 696 (2d Cir. 2004) ............................................................................................ 33

*Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*,
   719 F.2d 42 (2d Cir. 1983) .............................................................................................. 24

*Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*,
   353 F. Supp. 3d 1070 (D. Colo. 2018) ........................................................................... 31

*Bisnews AFE (Thailand) Ltd. v. Aspen Rsch. Grp. Ltd.*,
   437 F. App'x 57 (2d Cir. 2011) ...................................................................................... 30

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   598 F.3d 30 (2d Cir. 2010) ............................................................................................. 18

*CLS Invs., Inc. v. Stone Transportation Agency, LLC*,
   No. AANCV166020142S, 2017 WL 4508726 (Conn. Super. Ct. Aug. 30, 2017) ................... 32

*Cont'l Grp., Inc. v. Amoco Chemicals Corp.*,
   614 F.2d 351 (3d Cir. 1980) ........................................................................................... 28

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*,
   96 F.4th 351 (2d Cir. 2024) ............................................................................... 21, 22, 23

*Entegee, Inc. v. Korwek*,
   No. 3:15-CV-1087 (VLB), 2015 WL 5202902 (D. Conn. Sept. 4, 2015) ............................... 22

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d Cir. 2007) ....................................................................................... 17, 25

*Hanson Tr. PLC v. SCM Corp.*,
   774 F.2d 47 (2d Cir. 1985) ............................................................................................. 17

*Huang v. Siam Com. Bank Pub. Co.*,
   247 F. App'x 299 (2d Cir. 2007) (applying New York law) ......................................... 33

*In re Clearview AI, Inc., Consumer Priv. Litig.*,
   No. 21 C 0135, 2021 WL 5862497 (N.D. Ill. June 14, 2021) ................................... 26, 27

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   680 F. Supp. 3d 1011 (N.D. Ill. 2023) ........................................................................... 28

*Int'l Controls Corp. v. Vesco*,
   490 F.2d 1334 (2d Cir. 1974) ......................................................................... 34

*Kreger v. McCance*,
   537 F. Supp. 3d 234 (D. Conn. 2021) ...................................................... 18, 25, 30

*Lin v. Great Rose Fashion, Inc.*,
   2009 WL 1544749 (E.D.N.Y. June 3, 2009) ................................................. 33

*Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n*,
   965 F.2d 1224 (2d Cir. 1992) ......................................................................... 18

*Lucente v. Int'l Bus. Machines Corp.*,
   310 F.3d 243 (2d Cir. 2002) ........................................................................... 35

*Mastrio v. Sebelius*,
   768 F.3d 116 (2d Cir. 2014) ........................................................................... 22

*McMorris v. Carlos Lopez & Associates, LLC*,
   995 F.3d 295 (2d Cir. 2021) ........................................................................... 25

*Moshe v. Church Mut. Ins. Co.*,
   221 N.Y.S.3d 804 (N.Y. App. Div. 2024) ...................................................... 32

*MRI Broadway Rental, Inc. v. U.S. Mineral Prods. Co.*,
   662 N.Y.S.2d 114 (N.Y. App. Div. 1997) ...................................................... 32

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
   883 F.3d 32 (2d Cir. 2018) ..................................................................... passim

*Parra Rodriguez v. Noem*,
   No. 3:25-CV-616 (SRU), 2025 WL 1284722 (D. Conn. May 1, 2025) ................... 22

*PepsiCo, Inc. v. U.S. S.E.C.*,
   563 F. Supp. 828 (S.D.N.Y. 1983) ................................................................ 27

*Rochester Drug Co-Operative, Inc. v. Hiscox Ins. Co., Inc.*,
   466 F. Supp. 3d 337 (W.D.N.Y. 2020) .......................................................... 34

*Russell Reynolds Assocs., Inc. v. Usina*,
   No. 23 CIV 2369 (JHR), 2023 WL 3270344 (S.D.N.Y. May 5, 2023) ................... 36

*Sampson v. Murray*,
   415 U.S. 61 (1974) ......................................................................................... 30

*Sandstone Springs, LLC v. Virag Distribution, LLC*,
   617 F. Supp. 3d 159 (W.D.N.Y. 2022) .......................................................... 35

*Somoza v. New York City Dep't of Educ.*,
  538 F.3d 106 (2d Cir. 2008) ............................................................ 32

*Sosa v. Lantz*,
  660 F. Supp. 2d 283 (D. Conn. 2009) ...................................... 19, 20

*Strasbourger v. Leerburger*,
  134 N.E. 834 (N.Y. 1922) .............................................................. 35

*Warner Bros. Inc. v. Dae Rim Trading, Inc.*,
  877 F.2d 1120 (2d Cir. 1989) ........................................................ 19

*Whipper v. Green*,
  No. 3:23-CV-27 (SVN), 2024 WL 3771786 (D. Conn. Aug. 13, 2024) ................. 22

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................... 17, 25

**Statutes**

18 U.S.C. § 1836(d) ...................................................................... 33

Conn. Gen. Stat. §§ 35-56, 52-584 ...................................................... 33

**Rules**

Fed. R. Civ. P. 65(c) ...................................................................... 34

N.Y. C.P.L.R. 213 .......................................................................... 33

N.Y. C.P.L.R. 214(4)-(5) ................................................................... 33

Defendants Fiserv Solutions, LLC (f/k/a Fiserv Solutions, Inc.) ("Fiserv") and Fiserv, Inc.[1] submit this initial opposition to Cencap Federal Credit Union's ("Plaintiff" or "Cencap") Motion for a Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery (the "Motion," Dkt. 3).

## **INTRODUCTION**

There is no legal or factual basis for entry of a temporary restraining order or a preliminary injunction here.  Fiserv has provided the products and services at issue (Virtual Branch and Client360) to Cencap without incident or complaint for years (for Virtual Branch, more than a decade).  Out of the blue, Cencap sent a demand letter on May 28, asserting that Virtual Branch and Client360 have fundamental security deficiencies that put Cencap member data at imminent risk.  Cencap's complaint and the Motion soon followed.

But nothing has changed over the last decade.  There was no data breach, security incident, or other precipitating event creating an "emergency."  These products function as they always have; and Cencap certainly has known all along that its Virtual Branch enrollment process does not (and has not) used multi-factor authentication.  Still, Cencap demands that the Court issue a mandatory injunction that would fundamentally alter, not preserve, the status quo.  Cencap characterizes its request as "narrowly tailored," but Cencap demands sweeping and complex changes to the products Fiserv contractually provides and would require Fiserv to institute multi-factor authentication on every product or system that touches, processes, or holds Cencap's data (defined with incredible breadth).

---

[1] Fiserv, Inc. is the parent company of Fiserv Solutions, LLC and has no contractual relationship with Cencap.  Fiserv, Inc. is not a proper defendant in this action and reserves all rights to seek dismissal and other appropriate relief.

Such expansive and mandatory relief is not a legally permissible use of a TRO in any case, and Cencap comes nowhere close to meeting the heightened standard required for a mandatory preliminary injunction.  Cencap's core "security deficiency" allegations—that Virtual Branch is imminently susceptible to a "brute force attack" because it does not use security features like captcha or rate limiting, and that Client360 does not employ multi-factor authentication—are simply and flatly wrong.  One wonders where Cencap and its proffered "expert" got their information or what basis exists for these allegations.  (Fiserv's counsel told Cencap that Client360 employs multi-factor authentication on June 2, but Cencap filed a complaint and the Motion saying the opposite anyway.)  The facts make clear that Virtual Branch and Client360 have reasonable and appropriate security measures.  That Cencap has not experienced any data breach, security incident, or event in the last decade makes that obvious.

The reality is that this case is not about "security" or an "emergency" requiring a change in the status quo.  The only "change" here is that Cencap apparently now (Mr. Festini recently took over as CEO) prefers an account processing vendor other than Fiserv.  Cencap certainly can make that business decision and has the right to terminate the parties' contractual relationship upon payment of contractually specified termination fees and the fees for transferring Cencap's account data from Fiserv to the new vendor (a process known as "deconversion").  But Cencap does not want to pay and instead has alleged "material breaches" (the claimed security deficiencies) that (despite seeking mandatory injunctive relief) Cencap claims to be "incurable," and announced its intent to terminate the parties' agreement.  That agreement requires good faith participation in a dispute resolution process before either party files suit (and one would think Cencap would prefer to discuss "security" issues privately if it is truly focused on protecting its members), but there is

an exception for injunctive relief.  Thus, the Motion; Cencap wants to create leverage by generating adverse publicity for Fiserv with reckless, public claims of "security deficiencies."

As the motion emphasizes, Cencap's counsel has sued Fiserv multiple times.  Fiserv is familiar with this playbook.[2]  The second part of the playbook is Cencap's demand for expedited, enterprise-wide discovery.  Unable to establish any security breach, Cencap needs to find one. That, too, is an improper use of the expedited procedures that Rule 65 contemplates.[3]

Cencap is free, of course, to assert breach of contract or whatever claims it thinks it has against Fiserv, but there is no factual or legal basis for a TRO or preliminary injunction.  The Court should deny all interim relief (whether a TRO or preliminary injunction) without further proceedings, and this case should move forward on an ordinary track for discovery and trial.

---

[2] In fact, Cencap's counsel lauded this strategy in an article they wrote for the Credit Union Times, describing another credit union client who "[f]aced with steep early termination fees from [Fiserv], . . . didn't simply write a check. Instead, [counsel] rolled up his sleeves and delved into the cybersecurity record of [Fiserv]. After uncovering cybersecurity problems, his credit union negotiated an exit from the [Fiserv] contract without any early termination fees."  (https://www.barclaydamon.com/webfiles/Credit%20Union%20Times%20-%20Charles%20Nerko%20and%20Brian%20Rich%20-%2010%2020%2023%20-%20WITH%20REPRINT%20PERMISSION.pdf (last accessed June 8, 2025 at 1:44 p.m. CST).)

[3] Cencap blithely asserts that expedited discovery is necessary because Fiserv (and, really, its lead counsel, Mr. Wronski) cannot be trusted.  Fiserv will not dignify such unprofessional *ad hominen* attacks with a response other than to say they are baseless and unfortunate.  Fiserv does note that, in discussing its so-called "admission" on this issue, Cencap excised a material portion of Fiserv's answer to Paragraph 196 of the operative complaint in the Bessemer matter.  (Dkt. 3-2 at 9-10.)  Fiserv's full response (with the portion Cencap excised in emphasis) reads as follows:

> "Admit that, during discussions between the parties respective personnel after the hearing on Bessemer's motion, the parties discovered that certain documents had inadvertently not been sent to Bessemer; except as so stated, deny the allegations of Paragraph 196, ***specifically denying any assertion that Fiserv Solutions intentionally withheld or misrepresented the status of such documents.***"

*Bessemer System Federal Credit Union v. Fiserv Solutions, LLC, et al.*, Case No. 2:190cv-00624-RJC, Dkt. 88 ¶ 196 (emphasis added).

## FACTUAL BACKGROUND

### I.    THE MASTER AGREEMENT AND THE PARTIES' THIRTEEN-YEAR RELATIONSHIP WITHOUT A DATA SECURITY ISSUE.

Fiserv and Cencap have been parties to a Master Agreement since 2016 (Dkt. 1, Ex. 2), pursuant to which Fiserv has provided Cencap with the account processing and related products and services described in various schedules to the agreement.  Fiserv has multiple "core" processing systems that provide these services.  (Declaration of Debbie Dennis ("Dennis Decl."), ¶ 4.)  Cencap uses the "CUSA" core.  (*Id.*)  The Master Agreement contains an integration clause and is governed by New York law.  (Dkt. 1, Ex. 2, §§ 12(c), (e).)

The Master Agreement had an initial five-year term and provides for automatic renewal unless either party gives advance notice of its desire not to renew.  (*Id.*, Ex. 2, ASP Services Exhibit, § 7(a).)  Cencap has not (before its recent demand letter) provided such notice, so the Master Agreement has remained in effect since 2016.  (Dennis Decl., ¶ 7.)  The current term expires in March 2029.  (*Id.*)  Cencap may terminate for convenience before expiration of the then-current term subject to payment of contractually calculated early termination fees.  (Dkt. 1, Ex. 2, ASP Services Exhibit, § 7(b).)  And, upon either expiration or termination of the Master Agreement, Cencap contracted to pay Fiserv (in addition to other amounts due) for the services necessary to transfer Cencap's data to a new account processing vendor (a process known as "deconversion") before Fiserv releases that data to Cencap or the new vendor.  (*Id.*, Ex. 2, ASP Services Exhibit, § 7(e).)

Fiserv made limited and finite warranties with respect to its services in the Master Agreement.  Fiserv warranted that "it complies with all laws and regulations directly and unambiguously applicable to Fiserv in the performance of its obligations as a technology solutions

provider under this Agreement."[4]  (*Id.*, Ex. 2, § 6(a).)  Fiserv further warranted that its services would conform to the specifications in the Schedules and the documentation describing Fiserv's services.  (*Id.*, Ex. 2, ASP Services Exhibit, § 3(e)(i).)  Fiserv disclaimed any warranty not expressly made in the Master Agreement.  (*Id.*, Ex. 2, § 6(c).)  In particular, the Master Agreement makes clear that "Fiserv does not represent that the Deliverables meet Client's requirements or that the operation of the Deliverables will be uninterrupted or error-free.  Client acknowledges that it has independently evaluated the Deliverables and their application to Client's needs."  (*Id.*)  The Master Agreement also imposes a contractual two-year statute of limitations.  (*Id.*, Ex. 2, § 7.)

The Master Agreement expressly sets forth the parties' respective obligations with respect to Information Security.[5]  (*Id.*, Ex. 2, § 4.)  Fiserv agreed to provide Cencap with notice of unauthorized access to certain of Cencap's client information.  (*Id.*)  In turn, Cencap promised to "notify Fiserv as soon as possible upon becoming aware of any incident of unauthorized access to information or the Fiserv System."  (*Id.*, Ex. 2, ASP Services Exhibit, § 4(f).)  Over the entirety of the parties' relationship, Cencap has never provided such a notice and (based on such lack of notice) is presumably aware of none.  (Dennis Decl., ¶ 32.)  The declarations that Cencap has offered do not identify any data security incident or breach.  (*See* Dkts. 3-3, 3-9, 3-10.)

The "audit rights" provided to Cencap under the Master Agreement are far more limited than Cencap suggests in the motion.  At the outset, Fiserv has no obligation to provide any report

---

[4] The Master Agreement does not delegate all compliance obligations to Fiserv, however; Cencap similarly warranted that it "would comply with all laws and regulations directly and unambiguously applicable to it" as a financial institution with respect to the services Fiserv provides.  (Dkt. 1, Ex. 2, § 6(b).)

[5] Cencap suggests that this part of the Master Agreement contains an acknowledgement of "irreparable harm" by Fiserv.  (Dkt. 3-2 at 13.)  The provision Cencap cites, however, appears in the "Confidentiality and Ownership" section.  (Dkt. 1, Ex. 2, § 3(b).)  And it merely acknowledges that a breach of a party's contractual confidentiality obligations (which has not occurred here) "may" cause such harm and acknowledges the right of the other party only to "seek" injunctive or equitable relief.  (*Id.*)  Fiserv has not—in the Master Agreement or otherwise—conceded that Cencap has incurred any harm, much less irreparable harm.  To the contrary, Fiserv denies any breach of its obligations or any harm to Cencap.

or document without a written request from Cencap.  (Dkt. 1, Ex. 2, § 4(b).)  Where the Master Agreement specifies the time within which that should occur, the period is not less than 30 days. (*Id*.)  And in the "Audit" section itself, Cencap acknowledged that, with respect to reports of examination by regulators, agencies, and the FFIEC, "reports of such examination of Fiserv business units are available to [Cencap] directly from" such agencies.  (*Id.*, Ex. 2, § 10(a).)  With respect to this matter, Cencap had not made a written request for any audits or reports before its counsel's demand letter to Fiserv on May 28, 2025.  (Dennis Decl., ¶ 33.)

Finally, the parties agreed in the Master Agreement to a mandatory dispute resolution process that requires each party to designate representatives who must "work in good faith to resolve disputes and claims" before a party may initiate litigation (with a carve-out for injunctive relief).  (Dkt. 1, Ex. 2, § 9.)  Over the parties' longstanding relationship, Cencap has not invoked this process, including with respect to the instant dispute.  (Dennis Decl., ¶ 34.)

## II.    CLIENT360 EMPLOYS MULTI-FACTOR AUTHENTICATION UNLESS CENCAP TURNED IT OFF.

Client360 is an online portal that Fiserv makes available to Cencap (and other Fiserv clients) that permits Cencap employees to submit service request "tickets" to Fiserv's technical support team and for Fiserv to respond to those inquiries.  (Declaration of Matthew Parmigiani ("Parmigiani Decl."), ¶ 3.)  Fiserv implemented Client360 approximately three years ago.  (*Id.*) Client360 is not unique to Cencap, and the Master Agreement does not contain a schedule or specification defining features or requirements for Client360, including with respect to security. (*Id*; *see generally* Dkt. 1, Ex. 2.)

Since its inception, Client360 has had robust security protocols, ***including multi-factor authentication***.  (Parmigiani Decl., ¶¶ 6-12.)  Client360 has always required a username, password, and a one-time verification code, sent separately to the employee seeking access, before

a client's employee (including any Cencap employee) may access the Client360 portal. (*Id.*, ¶¶ 6-12.) Indeed, Client360's default settings require multi-factor authentication. (*Id.*, ¶ 11.) Under these default settings, when a Cencap employee successfully enters login credentials, they are redirected to a multi-factor authentication process, which requires the employee to request a verification code to authenticate their account. (*Id.*, ¶ 8.) The employee may receive the code to either the mobile phone number or email address associated with their Client360 account. (*Id.*) The employee must receive and enter the verification code to complete the log-in process and access Client360. (*Id.*, ¶ 9.)

Fiserv clients can change this default setting. Specifically, a Cencap employee (or any other credit union employee) may select "trust the browser on this device" after they input their one-time code. (*Id.*, ¶ 11.) If the Cencap employee selects that option, the employee will not be prompted to complete multi-factor authentication for any subsequent log-in attempts from the same browser and device for ninety days. (*Id.*) If the Cencap employee attempts to log into Client360 from a different browser or device within those ninety days, multi-factor authentication again will be required. (*Id.*) Selecting this setting, however, is entirely within the control of the Cencap employee, not Fiserv. (*Id.*)

Simply put, if Cencap's "expert" did not "observe" multi-factor authentication when logging onto Client360, that is because a Cencap employee essentially temporarily turned that feature "off" at some point via the "trust this browser" selection. Cencap's assertion that Client360 "does not have" multi-factor authentication is flatly false.

Indeed, Client360 employs robust security measures in addition to multi-factor authentication. An employee's password must meet industry-standard security requirements, including: (i) specific character lengths; (ii) a certain number of capital and lowercase letters; (iii)

a certain number of numeric and special characters; and (iv) restrictions on the use of certain words or numeric combinations in the password itself. (*Id.*, ¶ 6.) These protocols make it highly unlikely that a malicious actor could decipher—through an automated process or otherwise—an employee's password to access Client360. (*Id.*) Yet, Client360 also employs a rate limitation security control, which temporarily locks out the user attempting to gain access after five failed log-in attempts. (*Id.*, ¶ 7.) These features substantially mitigate the risk of successful "brute force" cyberattacks. (*Id.*, ¶¶ 6-7.)

Client360 incorporates additional security features that provide Cencap with significant control. Cencap's chosen "administrator" creates and manages authorized employee accounts, determining (among other things) which employees can access Client360, what information the employee can access within the Client360 portal, and which mobile phone or email address to use for transmitting the multi-factor authentication verification code. (*Id.*, ¶ 5.) The administrator can, for example, "turn off" an employee's access to "sensitive information," precluding that employee from accessing the "confidential" member information that Cencap (wrongly) asserts is freely accessible through Client360.[6] (*Id.*) Client360 is secure, and Cencap's contrary accusations are baseless.

## III. VIRTUAL BRANCH IS SECURE AGAINST BRUTE FORCE ATTACKS AND VIRTUAL BRANCH'S LAYERED SECURITY MEASURES PROVIDE ALL THAT CENCAP HAS PAID FOR.

Virtual Branch is an online banking platform that Cencap's members can voluntarily elect to use to access their credit union accounts through a computer or mobile device. (Dennis Decl.,

---

[6] Further, Cencap's suggestion that Client360 access is equivalent to unfettered access to Cencap's systems and data is specious. Client360 merely enables users to create service tickets about technical issues with Fiserv products and to communicate with Fiserv to resolve them. (Parmigiani Decl., ¶ 3-4.) Client360 users are not able to manipulate credit union member data or settings through Client360, nor are users able to make changes to a client's core banking products through the portal. (*Id.*) Client360 is a service-ticket solution that permits Cencap to communicate with Fiserv about technical issues and troubleshooting, it is not a backend programming key. (*Id.*)

¶ 5.)   Virtual Branch works with various Fiserv "core" processing platforms but interacts differently with each.  (*Id.*, ¶¶ 5-6.)  Here, Cencap uses the CUSA processing platform.  (*Id.*, ¶ 4.)

Fiserv has provided Virtual Branch to Cencap since 2012, first under an agreement that pre-dated the Master Agreement.  (Dennis Decl., ¶ 7.)  During the parties' relationship under the Master Agreement, two different schedules have addressed the Virtual Branch services that Fiserv provides to Cencap.  (*Id.*, ¶ 7.)  Until December 5, 2023, the Virtual Branch Services Schedule to the ASP Services Exhibit controlled.  (*Id.*)  On that date, the parties terminated that schedule and replaced it with the Digital Online Banking Services Schedule.  (*Id.*)  Though Fiserv made modifications and enhancements, the Virtual Branch services that Fiserv has provided to Cencap have not fundamentally changed over the years or as a result of the change in schedules.  (*Id.*)

In particular, when used with the CUSA platform (as Cencap does), Virtual Branch enrollment has never used multi-factor authentication.  (*Id.*, ¶ 18.)  And, in fact, the CUSA platform's current programming does not support such multi-factor authentication for Virtual Branch enrollment.  (*Id.*)  Fiserv cannot immediately "turn on" multi-factor authentication for Cencap's Virtual Branch enrollment.  At no point during the parties' commercial relationship has this specific security measure been used by or available to Cencap with respect to Virtual Branch enrollment (*id.*,), and Cencap has obviously, through the course of its day-to-day operations, known that for over a decade.

Cencap correctly notes that both schedules relating to Virtual Branch include a line-term (with an associated fee) that refers to "multi-factor authentication" or "MFA."  (*See* Dkt. 1, Ex. 2, at 55; Dennis Decl., Ex. 2, at 9.)  Neither schedule, however, defines those terms, and those line-items constitute the only references to "MFA" in the Master Agreement.  (*Id.*)  At this point (and Fiserv will continue to investigate the matter), Fiserv has not ascertained what might have been

discussed about the term at the time the parties entered into the Master Agreement,[7] but a logical explanation is that "MFA" was shorthand for the layered security features that Fiserv did (and does) provide with respect to Virtual Branch.  (Dennis Decl., ¶ 26.)  Those features are currently called "Intelligent Authentication" (whose capabilities are described below), and those are the security features for which Cencap is billed monthly; there is no invoice line-item for "multi-factor authentication."  (*Id.*, Ex. 1.)

Cencap is demonstrably incorrect, however, that the absence of multi-factor authentication in its Virtual Branch enrollment process makes Cencap ripe for a "brute force attack" or that the Virtual Branch product is insecure.  (*Id.*, ¶ 18.)  This is perhaps best evidenced by the fact that Cencap did not report a single security concern or incident with Virtual Branch enrollment between 2016 and May 28, 2025, even though Cencap's Virtual Branch enrollment never featured multi-factor authentication.  (*Id.*, ¶ 32.)  That is because Fiserv uses various security protocols with Virtual Branch enrollment and multi-layered security features with Virtual Branch that, together as an integrated whole, make Virtual Branch secure and in conformance with industry standards.  And Fiserv has offered Cencap additional products to bolster the security of Virtual Branch even further, but Cencap has declined them, presumably deeming the additional security not worth the cost.  (*Id.*, ¶¶ 28-31.)

### A.  VIRTUAL BRANCH EMPLOYS MULTIPLE SECURITY MEASURES AGAINST BRUTE FORCE ATTACKS AT ENROLLMENT.

Virtual Branch enrollment refers to the process by which a member who already has an account with Cencap signs up for online banking through a computer or mobile device.  (*Id.*, ¶ 8.)

---

[7] Cencap's declarations shed no light on the subject.  Mr. Festini first joined Cencap in November 2024, and Mr. Mulvey has never been a Cencap employee or had any involvement in its contracting practices.  (*See* Dkt. 3-3, 3-9.)

At Cencap, enrollment requires that the member input their account number, last four digits of social security number, full social security number, and street address number.  (*Id.*, ¶ 11.)

Focusing exclusively on multi-factor authentication, Cencap asserts that Virtual Branch is vulnerable to "basic brute force attacks" in which bad actors use technology to cycle through an unlimited number of "guesses" that permit them to correctly complete these fields and create online access to a member's account.  (Dkt. 3-2 at 5; *see also* Dkt. 3-9, ¶¶ 1-4.)  That assertion—supported by the declaration of Cencap's "expert," Mr. Mulvey—inexplicably ignores the central and dispositive fact that Fiserv uses multiple security features at the enrollment stage to prevent precisely this type of attack.

Specifically, Fiserv uses "captcha" and rate limitation with lockout for Cencap's Virtual Branch enrollment.  (Dennis Decl., ¶¶ 9-10, 13-14.)  The Court is presumably familiar with "captcha"—a ubiquitous security tool—in which the user must answer a question or perform a task to "prove I am not a robot."  Below is a screenshot of the first step of Virtual Branch enrollment at Cencap, (*id.*, ¶ 9), which shows the captcha security control Fiserv has implemented to prevent automated "brute force attacks":



Strangely, Mr. Mulvey included a screenshot in his declaration, but that screenshot reflects only the second step in the authorization process, (Dkt. 3-9 at 4), which a Cencap member can reach only after completing the captcha. (Dennis Decl., ¶ 11.) Presumably, Mr. Mulvey, who claims to have "directly observed" the Virtual Branch enrollment process, (Dkt. 3-9 at 1), saw the captcha (unless he was only provided with a screenshot of the second step of enrollment) but makes no mention of the captcha security measure at all.

Cencap and Mr. Mulvey also ignore that Fiserv has imposed rate limitation with lockout on Virtual Branch enrollment. Fiserv's rate limitation security control locks the Virtual Branch enrollment process **after three failed attempts** to identify the correct (and corresponding) account number, last four digits of social security number, full social security number, and street address number. (Dennis Decl., ¶ 14.) Once instituted, the lockout remains in place for 24 hours. (*Id.*) (Had Cencap's expert actually tested the enrollment system by inputting incorrect "guesses" to see how many chances he would get, the rate limitation would have been apparent.[8])

Moreover, Cencap receives daily reports from the Fiserv system that permit it to monitor and investigate suspicious activity, including reports (at 5:30 a.m. Eastern each business day) that identify all new Virtual Branch enrollments from the previous day, allowing Cencap to identify any suspicious enrollments. (*Id.*, ¶ 15.) These layered security measures—captcha, rate limitation with lockout, and daily monitoring—are mandatory and provide ample security against the risk of "brute force" attacks. (*Id.*, ¶¶ 16-18.) Cencap and Mr. Mulvey ignore these facts, and Cencap's core factual allegation in this case—that Virtual Branch enrollment is unreasonably and dangerously vulnerable to fraudulent enrollment—is demonstrably false.

---

[8] Given that Cencap must not have conducted testing sufficient to trigger the rate limitation, it would appear that its sole basis for claiming that Fiserv does not use rate limitation is that "in another lawsuit Fiserv admitted that it never installed basic 'rate limiting' security controls on Virtual Branch." (*See* Dkt. 3-2 at 5.) That characterization is both false and misleading, and it relates to an allegation about events that occurred in ***2018***.

**B.  AS CONTRACTED, FISERV DEPLOYED INTELLIGENT AUTHENTICATION AND OTHER LAYERED SECURITY MEASURES FOR CENCAP IN VIRTUAL BRANCH.**

Virtual Branch is likewise secure after enrollment.  Similarly robust security controls are in place for using Virtual Branch to access accounts remotely.  Specifically, Fiserv provides Cencap with a security protocol called Intelligent (or Enhanced) Authentication.  (*Id.*, ¶ 22.)  This security tool performs a risk assessment following a successful attempted log-in (meaning the user entered the correct log-in credentials) that determines whether the access attempt represents an enhanced risk.  (*Id.*, ¶¶ 26-27.)  The risk assessment analyzes various factors, such as geolocation (where did the log-in occur) and the user's historical log-in practices (where and when does the user typically log in).  (*Id.*, ¶ 27.)  If the algorithm determines that the attempted log-in presents a suspicious risk profile, Virtual Branch "challenges" the log-in by prompting the user to answer a challenge question.  (*Id.*)

Fiserv also applies rate limitation with lockout at the log-in stage.  (*Id.*, ¶ 24.)  ***Four failed log-in attempts*** to Virtual Branch result in an ***indefinite lockout*** that can be lifted only once the member contacts Cencap to confirm their identity and credentials.  (*Id.*)  And, Cencap receives a daily report of lockouts to monitor suspicious activity with respect to particular accounts.  (*Id.*, ¶ 25.)

These multiple, layered security measures make Virtual Branch secure.  Although additional security measures are always possible (and, as explained below, have been offered to Cencap), Fiserv's security protocols, as an integrated whole, are reasonable and conform with industry standards and conventions.  That is why Cencap has not reported a single data security incident or event with Virtual Branch (or Client360) over the past decade.

### C. FISERV OFFERED A SECURITY ENHANCEMENT CALLED "SECURE NOW" TO CENCAP, WHICH CENCAP DECLINED.

Not later than December 5, 2023 (when the Digital Online Banking Services Schedule was added), Fiserv offered Cencap an enhanced security product for Virtual Branch called "SecureNow." (*Id.*, ¶ 31.) SecureNow includes additional layered security features that enhance the already robust security protocols, such as Intelligent Authentication, that Cencap already received for Virtual Branch. (*Id.*, ¶¶ 26-27, 29-30.) Among other things, SecureNow assesses (using multiple factors) each individual log-in attempt to a member's online account to determine whether to "challenge" that attempt and require a one-time password sent via SMS text or voice message to a member's known telephone number. (*Id.*, ¶ 30.) When such a challenge occurs, the member's account can only be accessed with the one-time verification code sent to the member's phone. (*Id.*) If the verification code is not entered, the account is locked to online access until the member contacts its financial institution and verifies the member's identity and credentials. (*Id.*)

As the Digital Online Banking Services Schedule reflects, Fiserv offered SecureNow to Cencap, but Cencap declined to purchase this additional security product. (*Id.*, ¶ 31.) Instead, Cencap elected to continue using the same Virtual Branch security protocols that had been in place for years. (*Id.*) Presumably, Cencap determined that the extra security protection was not worth the additional cost of the SecureNow product, a business decision that Cencap is entitled to make.

### IV. CENCAP PRECIPITATED THIS DISPUTE WITH A MANUFACTURED CLAIM OF "MATERIAL BREACH" DESPITE THE LACK OF ANY ACTUAL OR THREATENED SECURITY ISSUE IN ORDER TO BYPASS ITS DISPUTE RESOLUTION OBLIGATIONS AND GENERATE PUBLICITY.

Cencap has been using Fiserv's Virtual Branch product since *2012* and Client360 since the portal was introduced a few years ago. (*Id.*, ¶ 7; Parmigiani Decl., ¶¶ 2-3.) Cencap has used the Virtual Branch enrollment feature for years and has been well aware of the security protocols that the product does and does not have. Nothing in the Motion or declarations identifies any

precipitating incident or event with Virtual Branch that suddenly made Cencap question the security of the product.  (*See* Dkt. 3-3, 3-9, 3-10.)  The current version of Virtual Branch enrollment has been the parties' "status quo" for years.  (Dennis Decl., ¶ 18.)  The same is true for the Client360 platform.  (Parmigiani Decl., ¶ 12.)  During the parties' decade-long relationship, Cencap cannot point to a single data breach, data security incident, data security concern or customer complaint about data security with respect to Virtual Branch enrollment or Client360. (Dennis Decl., ¶ 32.)  Nothing "happened" to change that status quo.

Notwithstanding the Master Agreement's mandatory dispute resolution process, neither Mr. Festini nor any other Cencap employees expressed concerns about the security of Virtual Branch enrollment or Client360.  (*Id.*)  Cencap first raised this issue in the May 28, 2025 demand letter from its counsel.  (Dkt. 1, Ex. 4.)  That letter (which Fiserv received on May 29) did not invite a business or technical discussion about these issues or how to resolve them.  (*Id.*)  Instead, it announced that Fiserv was in material breach and that Cencap would seek an injunction if Fiserv did not agree to a "consent injunction" complying with all the "demands" in that letter by the very next day (May 30).  (*Id.*)  Despite demanding mandatory injunctive relief, Cencap asserted that the alleged breaches were "incapable of a cure" and that it would terminate the Master Agreement.[9] (*Id.*)

---

[9]  Cencap also made an incredibly broad and non-specific demand for so-called "audit records."  It demanded that Fiserv produce "all records required to be produced under the Master Agreement, including Sections 4(d), 10(b) and ASP Services Exhibit to the Master Agreement Sections 3(d), 3(f), and 5(c)."  (Dkt. 1, Ex. 4.)  Cencap also purported to demand, pursuant to 12 C.F.R., Party 748, Appendix (which has no applicability to Fiserv) all "audits, summaries of test results, and other equivalent evaluations of Fiserv's security."  (*Id.*)  Cencap demanded that these records include "logs and forensic reports of access to new account enrollment on Virtual Branch and log-ins to the Client360 portal, including those identifying any specific Cencap Federal members or employees whose accounts or information were placed at risk of compromised."  (*Id.*)  In the Motion, Cencap says repeatedly that Fiserv has "refused" to provide these records.  (Dkt. 3-2 at 1.)  While Fiserv will no doubt object to these boundless requests that far exceed anything permitted under the Master Agreement or the Federal Rules of Civil Procedure, the fact is that Fiserv simply did not address these demands in its response (or otherwise) and Cencap's allegation of a "refusal" is false.  If Cencap suggests that Fiserv "refused" simply by not providing these materials one business day later on Cencap's unilateral May 30 "deadline," that allegation is particularly disingenuous.

Fiserv responded to the demand letter on May 30, 2025. (Dkt. 1, Ex. 5.) Fiserv's response denied any breach, explained that Cencap's letter did "not describe any particular injury or incident that gives rise to any alleged concern that Fiserv can assess or evaluate further," and denied any grounds for injunctive relief. (*Id.*) Consistent with the Master Agreement, Fiserv designated Doug Donofrio, Head of Credit Union Services, as its representative for the dispute resolution process. (*Id.*) Fiserv's counsel then reached out to Cencap's counsel the following Monday with an interim proposal to avoid unnecessary injunction proceedings and move forward with the dispute resolution process on contractual and monetary issues. As part of that proposal, Fiserv offered to disable Virtual Branch remote enrollment (an approach Cencap's counsel requested with another credit union client) if Cencap remained unsatisfied with Virtual Branch's security protocols. (Disabling online enrollment would not impact members who have already enrolled, and new enrollees would do so by visiting or calling the credit union, rather than remotely on their computer or mobile device. (Dennis Decl., ¶ 20.))

In that same communication, Fiserv's counsel confirmed that Client360 does in fact employ multi-factor authentication. Cencap never inquired further with Fiserv's counsel on that subject. But on June 3, 2025, Cencap inquired directly with Fiserv about whether Client360 uses multi-factor authentication, via the Client360 portal itself. (Parmigiani Decl., ¶ 14.) Rather than waiting for a response from Fiserv's technical team, which came on June 9, (*id.*,) Cencap filed its complaint and motion asserting (wrongly) that Client360 does not use multi-factor authentication.

Cencap did not engage with Fiserv, did not designate a representative for dispute resolution, and did not accept (or discuss) Fiserv's interim proposal. Instead, Cencap filed this action and its motion publicly (and wrongly) asserting fundamental security deficiencies in the Virtual Branch

services that Cencap offers to its members.[10]  That was a rather odd way of proceeding for a credit union supposedly concerned about data security for its members; a good faith, private attempt to address Cencap's concerns would have better advanced that objective.  Cencap certainly had time and opportunity to do that, given the time it must have taken to prepare its complaint, three declarations (including from a self-proclaimed expert) and a 29-page brief.[11]

## ARGUMENT

Interim injunctive relief, whether a TRO or preliminary injunction, "is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008).  Such an order represents "one of the most drastic tools in the arsenal of judicial remedies."  *See, e.g.*, *Hanson Tr. PLC v. SCM Corp*., 774 F.2d 47, 60 (2d Cir. 1985); *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).  A demand for such drastic relief imposes a substantial burden.  A court may grant a preliminary injunction only where the petitioner shows (1) that irreparable harm—meaning actual, imminent harm that cannot be remedied with money damages—is likely to occur absent injunctive relief; and (2) a likelihood of success on the merits or sufficiently serious questions to make the merits a fair ground for litigation and a balance of hardships tipping decidedly toward the plaintiff.  *Kreger v. McCance*, 537 F. Supp. 3d 234, 240 (D. Conn. 2021) (citing *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30, 35 (2d Cir. 2010)).  Courts generally apply the same standard to requests for

---

[10]  Cencap's counsel was eager to disseminate the news, posting publicly on LinkedIn the same day the Motion was filed, announcing that he filed this lawsuit, proclaiming that this action is "a groundbreaking data security lawsuit," and claiming that his representation of Cencap in this matter is "shap[ing] the legal landscape in this evolving area." (https://www.linkedin.com/posts/charlesnerko_payment-co-faces-claims-for-shockingly-activity-7336801342310535170-bVj8 (last accessed June 11, 2025).)

[11]  In fact, it appears that Cencap has been working on this since at least April.  On April 30, Cencap submitted a question to the Client360 portal asking whether access to Client360 can be restricted to private networks only and whether multi-factor authentication can be activated on Client360.  (Parmigiani Decl., ¶ 13.)

both temporary restraining orders and preliminary injunctions.  *See, e.g.*, *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n*, 965 F.2d 1224, 1228 (2d Cir. 1992).

Where, however, a party seeks a mandatory injunction that alters the status quo, as Cencap does here, the analysis diverges.  Under no circumstances may a plaintiff, no matter the showing, receive a ***temporary restraining order*** that changes the status quo.  *See Sosa v. Lantz*, 660 F. Supp. 2d 283, 290 (D. Conn. 2009) (denying motion "because Plaintiff seeks a temporary restraining order that would provide him with affirmative relief *changing* the status quo"); *see also Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1124 (2d Cir. 1989) ("While Rule 65 permits the grant of a temporary restraining order without notice, such an order, as is indicated by the very word 'restraining', should issue only for the purpose of preserving the status quo and preventing irreparable harm  . . . .").  In certain cases, a preliminary injunction that changes the status quo may be appropriate, but the plaintiff must first show ***clear entitlement*** to the relief requested.  *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

Here, there is no question that (as to Virtual Branch enrollment) Cencap seeks mandatory relief that would alter the parties' thirteen-year status quo by requiring Fiserv to implement multi-factor authentication.  Cencap's request for a TRO, therefore, must be denied.  And Cencap cannot make the required showing to obtain that relief through a preliminary injunction either, because there is neither an imminent threat of irreparable harm nor a clear entitlement to relief.  Finally, even if Cencap could make the requisite showing, the Court could not grant meaningful interim relief in any event because Fiserv cannot implement multi-factor authentication for Virtual Branch enrollment quickly and without substantial hardship, and Client360 already has it.  To the extent Cencap has any viable claims, this is a basic breach of contract and damages case that should proceed (if at all) on an ordinary track for discovery and trial.

## I.     CENCAP IMPROPERLY SEEKS A MANDATORY INJUNCTION THAT CANNOT BE GRANTED THROUGH A TEMPORARY RESTRAINING ORDER.

Cencap unquestionably seeks mandatory relief and a change to the thirteen-year status quo between the parties. Virtual Branch enrollment has not had multi-factor authentication at any point during the parties' relationship, and Cencap asks the Court to require Fiserv to implement it now. In the Second Circuit, the status quo *ante* is "the last actual, peaceable uncontested status which preceded the pending controversy." *Id.* at 37 (quotations omitted). The law is clear that Cencap may not change the status quo through a TRO. *Sosa*, 660 F. Supp. 2d at 290.

Cencap relegates this fundamental point to a footnote. (Dkt. 3-2 at p. 8, n.2.) But the very case Cencap cites unequivocally refutes its argument. In *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, plaintiff sought a mandatory injunction ordering defendant insurance syndicate to pay plaintiff's defense costs under a policy, something the defendant had never done and contested its obligation to do. 96 F.4th 351, 356–57 (2d Cir. 2024). Holding that the plaintiff sought mandatory relief that would require the defendant to do something it had never done before, the Second Circuit squarely rejected the precise argument Cencap makes here—that the requested injunction was prohibitory because it would only require the defendant to do what it was obligated to do under the contract. *Id*. at 357 ("Daileader's suggestion that an injunction would only 'enforce what [defendant] already was obligated to do' is unpersuasive. Rather, what [defendant] was 'obligated to do' is precisely what the parties could have disputed then and still dispute now.").

Cencap generically asserts that the relief it wants is not "mandatory" because "[p]reserving the status quo is not confined to ordering the parties to do nothing: it may require parties to take action." (Dkt. 3-2 at p. 8, n.2.) That is true as far as it goes, but is irrelevant here. The injunction Cencap wants is not mandatory because it would require Fiserv to act; it is mandatory because it

would require Fiserv to perform markedly differently than it has for the last thirteen years. *Daileader*, 96 F.4th at 357.

Cencap's cases stand only for the unremarkable proposition that the "status quo" is defined by the parties' positions before the dispute at hand.[12]  But just as in *Daileader* where "the last, peaceable status quo between the two parties was one in which the [defendant] had never paid those costs," 96 F.4th at 358, the last peaceable status quo here was one in which Fiserv did not provide the multi-factor authentication for Virtual Branch enrollment that Cencap would compel Fiserv to start providing now.  Cencap's requested order would alter the status quo, and therefore impermissibly seeks mandatory relief.  *See, e.g.*, *N. Am. Soccer League*, 883 F.3d at 37-38 (finding plaintiff sought mandatory injunction where plaintiff soccer league historically underwent an annual process of application, assessment, and sanction determination through defendant soccer federation and plaintiff sought "to alter this near-decade-long relationship").  Cencap may not use a TRO to alter the status quo.  The Court, therefore, should deny its motion with respect to Virtual Branch enrollment.  (Client360 already has what Cencap demands.)

## II.   CENCAP CANNOT MAKE EVEN THE RUDIMENTARY SHOWING REQUIRED FOR A TRO OR PRELIMIMARY INJUNCTION, GIVEN THE ABSENCE OF IRREPARABLE (OR ANY) INJURY AND THE LACK OF ANY REALISTIC POSSIBILITY OF SUCCESS ON THE MERITS.

For Cencap to obtain a preliminary injunction that changes the status quo, it must demonstrate clear entitlement to relief.  *Id.* at 37.  Cencap does not make that showing.  To the

---

[12] *See Entegee, Inc. v. Korwek*, No. 3:15-CV-1087 (VLB), 2015 WL 5202902, at *3 (D. Conn. Sept. 4, 2015) (holding status quo was the period when former employee worked for the plaintiff and before he began sharing confidential information with defendant competitor); *Mastrio v. Sebelius*, 768 F.3d 116, 121 (2d Cir. 2014) (finding status quo to be the long period during which plaintiff was receiving Medicare benefits before defendant terminated her coverage); *Parra Rodriguez v. Noem*, No. 3:25-CV-616 (SRU), 2025 WL 1284722, at *11 (D. Conn. May 1, 2025) (holding status quo was the many years during which plaintiff had a student visa and was pursuing her PhD at Yale before DHS terminated her student visa record and revoked that status); *Whipper v. Green*, No. 3:23-CV-27 (SVN), 2024 WL 3771786, at *1 (D. Conn. Aug. 13, 2024) (holding status quo was the prisoner's full participation in a prison program because that was his "original position, before the events that prompted this litigation").
.

contrary, Cencap cannot make even a rudimentary showing of irreparable harm or demonstrate a likelihood of success on the merits.  Thus, even if re-styled as one for a preliminary injunction, Cencap's motion must still be denied.  Instead, this case should proceed in an ordinary manner, with a routine discovery process and trial schedule, and in keeping with this Court's desire to "encourage the parties to combine the preliminary injunction hearing with a trial on the merits." *See* Pretrial Preferences: Special Proceedings, Hon. Vernon D. Oliver, https://www.ctd.uscourts.gov/content/vernon-d-oliver.

### A.  CENCAP'S SPECULATION ABOUT "LAX SECURITY" FAILS TO ESTABLISH IRREPARABLE HARM.

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction."[13]  *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983) (collecting cases); *see also, e.g. Kreger*, 537 F. Supp. 3d at 240.  The irreparable injury element requires Cencap to "demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Grand River Enter. Six Nations*, 481 F.3d at 66.  And, as the Supreme Court has made clear, Cencap must show that irreparable harm is not just ***possible***, but ***likely***.[14]  *Winter*, 555 U.S. at 22.

To grant the requested relief, therefore, the Court must conclude that Cencap has shown that sensitive account information of its members is likely to be compromised without immediate

[13] Cencap cannot rely on Section 3 of the Master Agreement to shift the burden on irreparable harm.  (Dkt. 3-2 at 13.)  First, Section 3 governs Confidentiality and Ownership, not Security Controls, and is therefore inapplicable to Cencap's claims here.  (Dkt. 1, Ex. 2, § 3.)  Second, even if this provision was relevant, Cencap cannot show any unauthorized disclosure of confidential information nor any threat of such disclosure.

[14] Indeed, Cencap's speculative focus on the mere possibility of future harm also raises the issue of Article III standing.  In the Second Circuit, without "allegations that an unauthorized third party purposefully obtained the plaintiffs' data," the "risk of future identity theft is too speculative to support Article III standing."  *See McMorris v. Carlos Lopez & Associates, LLC*, 995 F.3d 295, 301 (2d Cir. 2021).  Here, there has been no unauthorized disclosure at all, much less one caused by a cybercriminal's targeted effort to obtain Cencap's member data through Virtual Branch or Client360.

changes to the Virtual Branch and Client360 products. Cencap comes nowhere close to satisfying this fundamental requirement. As to Client360, Fiserv already employs multi-factor authentication, which Cencap concedes makes it secure. As to Virtual Branch enrollment, Cencap cannot show any imminent threat of a "brute force attack" or other security breach given Fiserv's use of captcha, rate limitation with lockout, and daily reporting. And Virtual Branch as a whole employs robust, layered security, including Intelligent Authentication. Cencap has used Virtual Branch for over a decade and Client360 for about the last three years without reporting a single security incident, event, or breach. What has actually happened during the parties' decade plus-long relationship belies Cencap's attempt to manufacture an "emergency" here. Cencap ignores the specific layered security protocols in Virtual Branch (including with respect to enrollment). Other than its say so, Cencap offers nothing to support the assertion that its member data is at present and imminent risk of compromise.

Cencap's unsupported and speculative accusation that "Fiserv's lax security puts the credit union's sensitive information at immediate risk" falls far short of establishing irreparable injury and a clear entitlement to relief. (Dkt. 3-2 at 2.) Another federal court reached precisely that conclusion in *In re Clearview AI, Inc., Consumer Priv. Litig.*, No. 21 C 0135, 2021 WL 5862497 (N.D. Ill. June 14, 2021). Like Cencap here, the plaintiffs in *Clearview AI, Inc.* relied on allegations of "lax security practices," claims that defendants "do not take security breaches seriously," and newspaper articles about the "general dangers of security threats" to suggest that the risk of identity theft constituted irreparable harm. *Id.* at *2. Denying the plaintiffs' motion for a preliminary injunction, the court held that such speculative and vacuous allegations did not establish irreparable injury:

> Plaintiffs' general arguments about the possibility of future data breaches and [defendants'] lax security practices suggest a mere possibility of irreparable harm,

not that they will likely suffer irreparable harm. Although the Court recognizes plaintiffs need not show that harm has already occurred, plaintiffs must present some evidence from which the Court can draw a reasonable inference that they are likely to suffer irreparable harm before final judgment. . . . In short, plaintiffs must do more than show that an irreparable harm 'could' arise." (citations omitted).

*Id*; *see also PepsiCo, Inc. v. U.S. S.E.C.*, 563 F. Supp. 828, 831 (S.D.N.Y. 1983) ("The mere possibility of confidential disclosures does not satisfy the irreparable harm requirement and hence justify even a TRO."); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 1011, 1022-23 (N.D. Ill. 2023) (denying motion for preliminary injunction for lack of irreparable harm where plaintiff claimed it faced increased security risks from defendants' practice of providing log-in credentials to third parties to access plaintiff's systems without authorization because plaintiff failed to provide evidence that defendants' conduct actually caused increased risk); *Cont'l Grp., Inc. v. Amoco Chemicals Corp*., 614 F.2d 351, 358-59 (3d Cir. 1980) ("Risk of harm if information is inadvertently disclosed, however, is not sufficient to satisfy the standard for granting a preliminary injunction . . . '[I]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties.'") (citations omitted).

Cencap tries to repackage its irreparable harm argument by claiming an imminent risk of trouble from its regulators under the Federal Credit Union Act and FFIEC guidance.  (Dkt. 3-2 at 16-17.)  But regulatory concerns would only stem from clearly deficient security practices that place sensitive data at imminent and unreasonable risk.  Yet, as detailed above and in Fiserv's supporting declarations, Cencap has not shown (and could not show) that any such risks exist.  Indeed, one presumes that Cencap has been examined, reviewed, and questioned by regulators about its security practices over the last decade, but Cencap does not identify a single regulatory issue with respect to Virtual Branch enrollment or Client360.  In short, Cencap's concerns about regulatory issues are (necessarily) as speculative and unsupported as its professed concerns about

an imminent brute force attack on Virtual Branch enrollment or the security of Client360, and cannot establish a threat of irreparable injury.

Finally, Cencap badly misstates FFIEC guidance and the Federal Credit Union Act in asserting that they require the use of multi-factor authentication.  First, Cencap does not cite to any provision of the Federal Credit Union Act that requires multi-factor authentication.  Second, the FFIEC guidance that Cencap cites is only that—guidance.  That guidance ***does not state*** that multi-factor authentication is the only acceptable method of safeguarding consumer financial accounts.  Quite the opposite, the FFIEC guidance makes clear that it "is not intended to serve as a comprehensive framework for identity and access management programs and does not endorse any specific information security framework or standard."  (Dkt. 3-5 at 2.)  Rather, the guidance counsels that "controls of equivalent strength" may provide similar risk mitigation results as multi-factor authentication, and ***nowhere*** does it state that multi-factor authentication is the only security control a financial institution should employ with respect to customer-account access.[15]  (*Id.* at 1, 7.)

At best, Cencap might show that it has been paying for multi-factor authentication and didn't get it.  (Fiserv disputes this; Cencap has been paying for, and Fiserv has been providing, Intelligent Authentication all along.)  That presents a basic breach of contract and damages case.  If, following litigation, Cencap prevails on this issue (despite receiving the Intelligent Authentication services for which it was invoiced), any proven loss can be adequately compensated with money.  As a result, Cencap cannot show irreparable harm.  *See Sampson v. Murray*, 415 U.S. 61, 90 (1974); *see also, e.g.*, *Bisnews AFE (Thailand) Ltd. v. Aspen Rsch. Grp.*

---

[15] Indeed, FFIEC guidance itself acknowledges that multi-factor authentication is not the infallible cure-all that Cencap suggests: "The attributes [of multi-factor authentication], including usability, convenience, and strength, of various authentication factors can differ and each may exhibit different vulnerabilities which may be exploited."  (*Id.* at 7.)

*Ltd.*, 437 F. App'x 57, 58 (2d Cir. 2011) (affirming denial of preliminary injunction in breach of contract dispute); *Kreger*, 537 F. Supp. 3d at 243 (same).

### B. CENCAP HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS, MUCH LESS CLEAR ENTITLEMENT TO THE RELIEF REQUESTED.

Cencap cannot show a likelihood of success on the merits on any of the claims raised in its motion—breach of contract, promissory estoppel, trade secret misappropriation, and negligence— much less that it is ***clearly entitled*** to the relief requested, as required to procure a mandatory injunction. *N. Am. Soccer League, LLC*, 883 F.3d at 37.

Cencap has employed a "kitchen sink" pleading approach. Each claim that Cencap asserts suffers from one or more fundamental flaws (likely to be addressed in motion practice).[16] Although the sheer number of Cencap's claims precludes an exhaustive analysis here, fundamentally, Cencap cannot establish the core factual premises of these claims—that Client360 does not use multi-factor authentication (it does) and that Virtual Branch is unreasonably vulnerable to unauthorized access (it is not). Fiserv's declarations refute Cencap's unfounded and

---

[16] For example, Cencap's ***"trade secret" claims fail*** as a matter of law, because credit union members' account information and data are not protectable trade secrets because they have "no independent economic value." *Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*, 353 F. Supp. 3d 1070, 1087 (D. Colo. 2018) (granting motion to dismiss trade secrets claim with prejudice). This is so because "[p]ayment card data (including cardholder names, credit or debit card numbers, and corresponding CVVs) are akin to passwords and usernames that provide *access* to something of value" and, thus, lack any independent economic value as they are merely the "key" that guards the presumably valuable information, but not the valuable information itself. *Id.* Member account data are also not trade secrets because members have no obligation to keep the information secret—indeed, a member's disclosure of account numbers and balances to third parties "make[s] the [information] valuable because it provides access to . . . money in the account." *See id.* at 1087-88. Put simply, the information is valuable because it is disclosed, not because it is kept secret. Cencap's ***negligence claims are barred*** by "the economic loss doctrine," which "prohibits recovery in tort when the claim only seeks to recover economic losses and arises from a contract between the parties." *CLS Invs., Inc. v. Stone Transportation Agency, LLC*, No. AANCV166020142S, 2017 WL 4508726, *2 (Conn. Super. Ct. Aug. 30, 2017). Cencap alleges no physical injury to persons or other property and cannot recover in negligence for the purely economic losses purportedly incurred due to Fiserv's contractual performance. The terms and conditions of the Master Agreement require dismissal of Cencap's ***promissory estoppel claim***; if Cencap cannot establish a breach of contract, it cannot recast that claim as one for promissory estoppel. *Moshe v. Church Mut. Ins. Co.*, 221 N.Y.S.3d 804, 808 (N.Y. App. Div. 2024) ("The existence of a valid and enforceable contract governing a particular subject matter precludes recovery under a promissory estoppel cause of action arising out of the same subject matter.").

unsupported accusations and preclude Cencap from showing clear entitlement to relief not only with respect to its breach of contract claims, but all of its claims.

Further, Cencap's claims are each barred by the statute of limitations. Plaintiffs whose claims are time-barred are not entitled to injunctive relief. *See Somoza v. New York City Dep't of Educ.*, 538 F.3d 106, 109 (2d Cir. 2008) (dissolving injunction because plaintiff's claims were time-barred); *MRI Broadway Rental, Inc. v. U.S. Mineral Prods. Co.*, 662 N.Y.S.2d 114, 117 (N.Y. App. Div. 1997) ("It is settled law that an equitable remedy is not available to enforce a legal right that is itself barred by the statute of limitations."). The statute of limitations for breach of contract and promissory estoppel is six years. *See* N.Y. C.P.L.R. 213; *Huang v. Siam Com. Bank Pub. Co.*, 247 F. App'x 299, 301 n.2 (2d Cir. 2007) (applying New York law). The statute of limitations for trade secret misappropriation and negligence are, at maximum, three years. *See* 18 U.S.C. § 1836(d); Conn. Gen. Stat. §§ 35-56, 52-584; N.Y. C.P.L.R. 214(4)-(5). And the Master Agreement imposes a contractual limitations period of two years. (Dkt. 1, Ex. 2, § 7.) Fiserv has provided Cencap with Virtual Branch since 2012 and Client360 for the last three years. Cencap's purported harm was clearly discoverable long ago.

### C.  THE INTERIM RELIEF THAT CENCAP SEEKS IS NOT REASONABLY FEASIBLE OR PRACTICAL AND WOULD IMPOSE AN UNNECESSARY AND UNFAIR HARDSHIP ON FISERV.

Even if Cencap could establish irreparable injury and a clear entitlement to relief, the relief that it seeks is not reasonably feasible nor practical and would impose an unnecessary and undue hardship on Fiserv.[17] "[T]he injunctive power of this court is constrained by practical reality." *Lin v. Great Rose Fashion, Inc.*, No. 08-CV-4778(NGG)(RLM), 2009 WL 1544749, at *22 (E.D.N.Y.

---

[17] Because of this (and because Cencap's claims rest on a complete misstatement of the facts), even *if* the lower standard for a prohibitory injunction applied, Cencap could not show it raised sufficiently serious questions and that the balance of hardships tip decidedly in its favor.

June 3, 2009) (denying motion for preliminary injunction for "prudential reasons" and noting that "[e]ven assuming irreparable harm could be shown," the court could not order reinstatement of plaintiffs to jobs that no longer exist); *see also, e.g., Bano v. Union Carbide Corp.*, 361 F.3d 696, 716 (2d Cir. 2004) (affirming denial of injunction where the plant-site remediation sought by plaintiffs would require cooperation of new owner of the land, making drafting and enforcing the injunction impracticable).

Fiserv already uses multi-factor authentication as the default for Client360. With respect to Virtual Branch enrollment in Cencap's CUSA environment, Fiserv cannot simply "turn on" multi-factor authentication. Incorporating multi-factor authentication into Virtual Branch enrollment for Cencap would require new software code and programming with respect to both the CUSA core platform and Virtual Branch. At a minimum, development, integration and testing of that new software code, even before it could be deployed for Cencap, would take weeks and possibly months at significant cost to Fiserv. (All of these are estimates that assume no unanticipated obstacles as this project is not on Fiserv's current product roadmap.)

Imposing such a burden on Fiserv would be unreasonable under the circumstances.[18] As Fiserv has detailed, Virtual Branch (including enrollment) has robust, layered security features. Cencap has not reported a data security breach, incident, or event with respect to Virtual Branch despite consistent use over more than a decade. If, despite using Virtual Branch without incident for that long, Cencap truly is uncomfortable with enrollment's security features, Cencap can simply disable online enrollment, eliminating entirely whatever security risk Cencap perceives to exist,

---

[18] Alternatively, should the Court grant Cencap's request for injunctive relief, this hardship to Fiserv means that Cencap should be required to post a security bond. Fed. R. Civ. P. 65(c); *see also, e.g., Rochester Drug Co-Operative, Inc. v. Hiscox Ins. Co., Inc.*, 466 F. Supp. 3d 337, 362 (W.D.N.Y. 2020) (noting that district courts can only dispense with the bond requirement "'where there has been no proof of likelihood of harm to the party enjoined'") (citing *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1356 (2d Cir. 1974)).

and assert a money damages claim against Fiserv if Cencap can prove that Fiserv did not provide something the Master Agreement requires. On balance, the inconvenience and burden to Cencap of disabling online Virtual Branch enrollment would be far less than the significant burden of requiring Fiserv to develop entirely new software only for Cencap.

Requiring Fiserv to provide a new service would not conform to New York's approach in breach of contract cases. If Cencap is dissatisfied with Fiserv's performance, Cencap may terminate the agreement (if it can prove a material breach), seek money damages, or both. But it is hornbook law that Cencap cannot instead simultaneously terminate the agreement, claim breach, and force Fiserv to perform. *Strasbourger v. Leerburger*, 134 N.E. 834, 835 (N.Y. 1922) ("[Plaintiff] could not at the same time treat the contract as broken and as subsisting. One course of action excludes the other."). Moreover, under New York law, Cencap is not entitled to the extraordinary remedy of specific performance on a breach of contract claim unless, among other requirements, there is no adequate remedy at law. *See, e.g., Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) ("[B]efore the 'extraordinary' equitable remedy of specific performance may be ordered, the party seeking relief must demonstrate that remedies at law are incomplete and inadequate to accomplish substantial justice."); *Sandstone Springs, LLC v. Virag Distribution, LLC*, 617 F. Supp. 3d 159, 176 (W.D.N.Y. 2022) ("To obtain specific performance, Plaintiff must establish its willingness and ability to perform its remaining obligations, that Defendant was able to perform its obligations, and that there is no adequate remedy at law to address Defendant's nonperformance.").

Cencap has not (and cannot) show that any claimed harm from a breach consisting of Fiserv's failure to provide multi-factor authentication for Virtual Branch enrollment could not be fully remedied by money damages. Precisely the opposite is true—a claim that Fiserv failed to

provide a service it was contractually obligated to provide is the textbook contract and money damages case. Cencap cannot use a "preliminary injunction" to secure equitable remedies in the nature of specific performance when money damages provide an adequate remedy.

## III.    CENCAP INAPPROPRIATELY SEEKS EXPEDITED DISCOVERY THAT IS TANTAMOUNT TO AN ENTERPRISE-WIDE FISHING EXPEDITION.

Cencap's request for expedited discovery should also be rejected. Without pointing to any security incident (or even a concrete risk of any security incident) Cencap seeks sweeping, enterprise-wide discovery on an expedited basis, presumably in the hope of finding something to support its claims. This is the classic fishing expedition.[19] Cencap cannot conjure up an "emergency" to force Fiserv to change its longstanding product features, or to bypass the normal course of discovery. A party should have evidentiary support *before* filing its claims in federal court—not use the lawsuit to find it.

At bottom, this case should not proceed on an expedited basis at all but should be set for discovery and trial in the ordinary course. Cencap should serve formal discovery requests, and the parties can work through the typical process of responses, objections, and meet and confers. Should the Court, however, deem that some expedited discovery is appropriate, Cencap's requests would require substantial narrowing and should be targeted at specific preliminary issues, not the ultimate merits. *See Russell Reynolds Assocs., Inc. v. Usina*, No. 23 CIV. 2369 (JHR), 2023 WL 3270344, *1 (S.D.N.Y. May 5, 2023) ("The requested discovery must be reasonably tailored to the time constraints under which both parties must proceed or to the specific issues that will have to be determined at the preliminary injunction hearing.") (internal citations omitted, cleaned up).

---

[19] Making broad and unsupported allegations of "security deficiencies" and then demanding sweeping discovery in the hope of finding some is a familiar tactic of Cencap's counsel. Another federal court has rejected this playbook before. *See* Special Discovery Master's Report, Recommendation and Proposed Order, *Bessemer System Fed. Cr. Union v. Fiserv Solutions, et al*., No. 2:19-cv-00624-RJC (W.D. Pa. June 13, 2023) (Dkt. 209), at 9 (R&R adopted and ordered at Dkt. 220).

## **CONCLUSION**

For the foregoing reasons, defendants respectfully request that this Court deny all interim relief (whether a TRO or preliminary injunction) without further proceedings, and this case should move forward on an ordinary track for discovery and trial.

Dated: June 13, 2025

                          Respectfully submitted,

                          /s/ Todd R. Michaelis (ct28821)
                        Todd R. Michaelis, Esq. (ct28821)
                        Carmody Torrance Sandak & Hennessey LLP
                        50 Leavenworth Street
                        Waterbury, CT 06721-1110
                        Telephone: 203-573-1200
                        Fax: 203-575-2600
                        tmichaelis@carmodylaw.com

                        Andrew J. Wronski (WI Bar No. 1024029)
                        Max B. Chester (phv208744)
                        Timothy J. Patterson (WI Bar No. 1087996)
                        Jesse L. Byam-Katzman (phv10743)
                        Grace E. Stippich (phv208739)
                        Foley & Lardner LLP
                        777 East Wisconsin Avenue
                        Milwaukee, WI 53202-5306
                        Telephone: 414-271-2400
                        Fax: 414-297-4900
                        AWronski@foley.com
                        MChester@foley.com
                        TJPatterson@foley.com
                        JByam-Katzman@foley.com
                        GStippich@foley.com

                        *Attorney for Defendants*
                        *Fiserv Solutions, LLC f/k/a Fiserv Solutions,*
                        *Inc. and Fiserv, Inc.*

30

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 13, 2025, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM-ECF System.

*/s/ Todd R. Michaelis (ct28821)*